| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Barry E. Borowitz, Bar #167418<br>Nancy B. Clark, Bar #207024<br>**Borowitz & Clark, LLP**<br>100 N. Barranca Avenue, Suite 250<br>West Covina, CA 91791<br>(626)332-8600 Tel.<br>(626)332-8644 Fax.<br>notices@blclaw.com<br><br>☐ *Debtor(s) appearing without an attorney*<br>☒ *Attorney for Debtor(s)* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – <u>LOS ANGELES</u> DIVISION**

| In re:<br><br>**ROBERT ALGOT WINBERG** | CASE NO.: **2:14-bk-12076-WB**<br>CHAPTER: **13** |
|---|---|
| | **DEBTOR'S NOTICE OF MOTION AND MOTION TO AVOID JUNIOR LIEN ON PRINCIPAL RESIDENCE**<br>**[11 U.S.C. § 506(d)]** |
| | DATE: April 9, 2014<br>TIME: 1:30 P.M.<br>COURTROOM: 1375<br>FLOOR: 13th |

1. TO: <u>JP Morgan Chase Bank, N.A. and OneWest Bank, FSB</u>

2. NOTICE IS HEREBY GIVEN that on the above date and time and in the indicated courtroom, Movant in the above- captioned matter will move this court for an Order granting the relief set forth in the Motion and accompanying supporting documents served and filed herewith.

3. Hearing Location:

   ☒ 255 East Temple Street, Los Angeles      ☐ 411 West Fourth Street, Santa Ana
   ☐ 21041 Burbank Boulevard, Woodland Hills    ☐ 1415 State Street, Santa Barbara
   ☐ 3420 Twelfth Street, Riverside

4. **Your rights may be affected.** You should read these papers carefully and discuss them with your attorney, if you have one. (*If you do not have an attorney, you may wish to consult one.*)

5. **Deadline for Opposition Papers:** This Motion is being heard on regular notice pursuant to LBR 9013-1. If you wish to oppose this Motion, you must file a written response with the court and serve a copy of it upon the Movant or Movant's attorney at the address set forth above no less than 14 days prior to the above hearing date. If you fail to file a written response to this Motion within such time period, the court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

---

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

6.  **Hearing Date Obtained Pursuant to Judge's Self-Calendaring Procedure:** The undersigned hereby verifies that the above hearing date and time were available for this type of Motion according the judge's self-calendaring procedures.

Date:  February 27, 2014

**Borowitz & Clark, LLP**
Printed name of law firm *(if applicable)*

**Barry E. Borowitz**
Printed name of Debtor or attorney for Debtor

Signature of Debtor or attorney for Debtor

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2012*                                          Page 2                          **F 4003-2.4.JR.LIEN.MOTION**

**MOTION TO AVOID JUNIOR LIEN ON PRINCIPAL RESIDENCE [11 U.S.C. §
506(d)] (DEBTOR: _ROBER A. WINBERG_)**

**NAME OF CREDITORS HOLDING JUNIOR LIENS (Respondent): _JP MORGAN CHASE BANK, N.A. AND
ONEWEST BANK, FSB_**

1. **Property at Issue:** Debtor moves to avoid the junior deed of trust, mortgage or other encumbrance (Lien)
   encumbering the following real property (Property), which is the principal residence of debtor.

   Street address:        _1481 East Covina Hills Road_

   Unit number:

   City, state, zip code:    _Covina, CA  91724_

   Legal description of Property or document recording number (*including county of recording*):

   ☒ See attached page for legal description of Property or document recording number.

2. **Case History:**

   a. A voluntary petition under chapter ☐ 7  ☐ 11  ☐ 12  ☒ 13 was filed on (*specify petition
   date):* _2/03/2014_.

   b. ☐ An Order of Conversion to chapter 13 was entered on (*specify date*): _____.

3. **Grounds for Avoidance of Junior Lien:**

   a. As of (*date of title review*) _2/03/2014_, the Property is subject to the following liens in the amounts specified
   securing the debt against the Property that the debtor seeks to have treated as indicated:

   (1) **Wells Fargo Home Mortgage** in the amount of $ **615,723.99** .

   (2) **JP Morgan Chase Bank, N.A.** in the amount of $ **197,901.94**  ☒ is  ☐ is not  to be avoided;

   (3) **OneWest Bank, FSB** in the amount of $ **93,498.77**  ☒ is  ☐ is not  to be avoided;

   ☐ See attached page for additional lien(s).

   As of _1/24/2014_, Property is worth no more than **$602,000.00**.

   b. As a result, each Respondent's Lien encumbering the Property is wholly unsecured.

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                                    Page 3                                    **F 4003-2.4.JR.LIEN.MOTION**

c. **Evidence In Support Motion:**

(1) ☒ The amount of the lien identified in paragraph 3(a)(1) is based on **a Wells Fargo Home Mortgage Payoff Statement Dated January 31, 2014** , attached hereto and identified as **Exhibit  1 .**

(2) ☒ The amount of the lien identified in paragraph 3(a)(2) is based on **the Proof of Claim filed by JP Morgan Chase Bank, N.A on 2/24/2014,** attached hereto and identified as **Exhibit  2 .**

(3) ☒ The amount of the lien identified in paragraph 3(a)(3) is based on  **the Proof of Claim filed by OneWest Bank, FSB on 2/17/2014**  attached hereto and identified as Exhibit  3 .

(4) ☒ The relative priority of the liens encumbering the Property is established by evidence attached as **Exhibits 2, 3 and 4. (deeds of trust illustrating priority of lien of Wells Fargo Home Mortgage per recording dates and numbers)**

(5) ☒ The value of the Property from paragraph 3(b) is based on **an appraisal report completed by Chad Harris on or about 1/24/2014,** attached as **Exhibit  5 .**

(6) ☒ Debtor submits the attached Declaration(s). **Debtors' Declaration and Appraiser's Declaration.**

(7) ☐ Other evidence *(specify/identify supplemental evidence)*: _____ attached as Exhibit _____.

d. **WHEREFORE, Debtor prays that this Court issue an Order granting this Motion an establishing that:**

(1) The Property is valued at no more than *(requested value)* **$602,000.00**.

(2) No payments are to be made on the secured claim of the Respondent, and regular mortgage maintenance payments are not to be made, before the Debtor's ☒ completion of the chapter 13 plan, or ☒ receipt of a chapter 13 discharge

(3) Respondent's(s') claim on the junior position lien(s) shall be allowed as a nonpriority general unsecured claim(s) in the amount per filed Proof of Claim.

(4) The avoidance of the Respondent's(s') junior lien(s) is contingent upon: Debtor's ☒ completion    of the chapter 13 plan, or ☒receipt of a chapter 13 discharge.

(5) The Respondents shall retain its/their lien(s) in the junior position for the full amount due under the corresponding note and lien in the event of either the dismissal of the Debtor's chapter 13 case, the conversion of the Debtor's chapter 13 case to any other chapter under the United States Bankruptcy Code, or if the Property is sold or refinanced prior to the Debtor's ☒completion of the chapter 13 plan or ☒receipt of a chapter 13 discharge.

(6) In the event that the holder of the first position lien or any senior lien on the Property forecloses on its interest and extinguishes the Respondent's(s') lien rights prior to the Debtor's completion of the chapter 13 plan and receipt of a chapter 13 discharge, the Respondent's(s') lien(s) shall attach to the proceeds greater than necessary to pay the senior lien, if any, from the foreclosure sale, subject to the priority of any such junior lien(s).

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                                              Page 4                                        **F 4003-2.4.JR.LIEN.MOTION**

e.  ☐  See attached continuation page for additional provisions.

Date: <u>February 27, 2014</u>

Respectfully submitted

_____
Signature of Debtor or attorney for Debtor

<u>**Barry E. Borowitz**</u>
Printed Name of Debtor or attorney for Debtor

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2012*                                    Page 5                              **F 4003-2.4.JR.LIEN.MOTION**

*Legal Description*

THAT PORTION OF LOT 3 OF THE CHAFFEY TRACT, IN THE CITY OF COVINA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 59 PAGE 14 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF COVINA HILLS ROAD (FORMERLY POMONA AND COVINA ROAD) AS SHOWN ON SAID MAP WHICH IS NORTH 67° 36' 35" WEST 265.41 FEET AND SOUTH 83° 16' 45" WEST 947.46 FEET FROM THE SOUTHEASTERLY CORNER OF SAID LOT 3; THENCE ALONG THE WESTERLY LINE OF THE LAND CONVEYED TO JAMES D.  RYAN, ET UX, BY DEED RECORDED ON JULY 12, 1960 AS INSTRUMENT NO. 2174 IN BOOK D907 PAGE 449 OF OFFICIAL RECORDS OF SAID COUNTY, NORTH 6° 43' 15" WEST 309.95 FEET TO THE NORTHWESTERLY CORNER OF SAID LAND; THENCE SOUTH 83° 16' 14"  WEST 61.40 FEET; THENCE SOUTH 38° 16' 45" WEST 68.73 FEET; THENCE SOUTH 6° 43' 15" EAST 261.40 FEET TO SAID NORTHERLY LINE OF COVINA HILLS ROAD; THENCE ALONG SAID NORTHERLY LINE, NORTH 83° 16' 45" EAST TO THE POINT OF BEGINNING.

APN: 8447-005-030

## DECLARATION OF ROBERT A. WINBERG

I, Robert A. Winberg, hereby declare as follows:

1. That I am the Debtor in the herein Chapter 13 bankruptcy;

2. That I have personal knowledge of the facts set forth below and if called upon to testify, I could and would competently testify thereto;

3. That I caused to be filed the instant Chapter 13 bankruptcy on February 3, 2014 (Case number: 2:14-bk-12076-WB);

4. That I originally purchased the property located 1481 E. Covina Hills Road Covina, CA 91724 ("Property") in 1988 at the price of $325,000.

5. That I valued the Property at $602,000.00 based on my knowledge of comparables in my neighborhood;

6. That my valuation is also supported by an appraisal report completed on January 24, 2014, by Chad Harris, a licensed real estate appraiser (see Declaration of Chad Harris);

7. That the current balance owed on my first mortgage held by Wells Fargo Home Mortgage is approximately $ 615,723.99 (see previously referenced "Exhibit 1");

8. That the current balance owed on my second mortgage held by JP Morgan Chase Bank is approximately $ 197,901.94 (see previously referenced "Exhibit 2");

9. That the current balance owed on my third mortgage held by OneWest Bank is approximately $ 93,498.77 (see previously referenced "Exhibit 3");

10. That Wells Fargo Home Mortgage represents my First Deed of Trust (see previously referenced "Exhibit 4");

11. That JP Morgan Chase Bank represents my Second Deed of Trust (see previously referenced "Exhibit 2"):

12. That OneWest Bank represents my Third Deed of Trust (see previously referenced "Exhibit 3"):

13. That the encumbrance by the First Deed of Trust exceeds the fair market value of the Property ($602,000.00);

14. That I respectfully request that post-petition payments with respect to the 2nd and 3rd Deeds of Trust to JP Morgan Case Bank and OneWest Bank be stayed;

15. That I respectfully request that upon completion of all plan payments and entry of discharge in this case, the Second and Third Deeds of Trust of JP Morgan Chase Bank and OneWest Bank will be void and will not constitute an encumbrance on the real property described in the motion.

I, Robert A. Winberg declare under penalty of perjury that the foregoing is true and correct and that the declaration was executed on _2/26/2014_ at _West Covina_ California.

Robert A. Winberg

8

## DECLARATION OF CHAD HARRIS

I, Chad Harris, hereby declare and state as follows:

1.  I have personal knowledge of the facts set forth below and if called upon to testify, I could and would testify thereto in a court of law;

2.  I have been a Real Estate Appraiser for the last 9 years and have been licensed for over 7 years;

3.  On January 24, 2014, I was retained by Robert A. Winberg to appraise his residence located at 1481 E. Covina Hills Road Covina, CA 91724;

4.  I am familiar with the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Standards Board of The Appraisal Foundation and I appraised the Winberg residence in conformity with these Standards;

5.  I personally inspected the interior and exterior of the subject property and based upon my comparison of the subject property with the properties listed as comparable in my appraisal report, I concluded that the subject property was worth approximately $602,000 as of January 24, 2014, (see attached as Exhibit___5___, a true and correct copy of the Residential Appraisal Report dated January 24, 2014).

I declare under the penalty of perjury that the foregoing is true and correct and that this declaration was executed on January 28, 2014 in Fontana, California.

Chad Harris

# EXHIBIT "1"

10

708/0170777056/XP521/1/4



WELLS **HOME**
FARGO **MORTGAGE**

January 31, 2014


Attn Barry Borowitz
866 821 3381




|  |  |
|---|---|
| Mortgagor: | Robert A Winberg |
| Co-Mortgagor: | Susan M Winberg |
| Property: | 1481 E Covina Hills Road |
|  | Covina CA 91724-3623 |

Requestor phone no: (626)484-0959

708 Loan Number:  0170777056                    Loan Type: Convention

Wells Fargo Home Mortgage recently received an inquiry regarding a payoff of your mortgage. Attached is the payoff statement for your review

The statement indicates your loan interest is calculated on a daily basis. We will collect interest until the day we receive the payoff funds.

Note: We will continue to make disbursements from your escrow account as bills become due. Questions about pending disbursements, please call us. Any amount held in escrow at closing will be settled in accordance with the applicable federal law.

BORROWER'S RESPONSIBILITIES: Please take care of these important items
* If you're planning to move, be sure to provide us with your new mailing address on the enclosed Payoff Coupon. We'll send you any remaining balance in your escrow account, year-end interest statements and other documents to your new address.

* If your payments are automatically withdrawn by us or other services (Bill Pay, 3rd Party, Internet Banking, etc.) please cancel at least 5 business days before your next scheduled withdrawal date.

* Please do not place a stop payment on any mortgage payment check or electronic withdrawal already made. We'll refund any remaining account balance to you. Figures may be adjusted if a previously credited mortgage payment is rejected by the institution from which it is drawn


If you have questions or need further assistance, please contact us at 1-866-234-8271, Monday - Friday, 6:00 a.m. to 10:00 p.m.; or Saturday, 8:00 a.m. to 2:00 p.m. Central Time.

11                          EX 1 pg 1 of 2

708701707770567XP5227274700000615?2399
January 31, 2014                    Page 2 - 708 Loan Number 0170777056

Attn Barry Borowitz
866 821 3581

Mortgagor:          Robert A Winberg
Co-Mortgagor:       Susan M Winberg
Property:           1481 E Covina Hills Road
                    Covina CA 91724-3623
708 Loan Number:    0170777056
Loan Type:          Conventional

The figures in this statement are based on the payoff/closing date
02-11-14 provided to us. You must verify all figures 24 hours prior to
payoff by calling us and selecting the appropriate payoff quote options.
All figures are subject to final verification by the noteholder. We
prefer funds be made by wire, cashier's check or certified funds.

1.  TOTAL PRINCIPAL, INTEREST AND OTHER AMOUNTS DUE UNDER NOTE/SECURITY
INSTRUMENT
Note: This Note/Security Instrument is due for payment August 01, 2013
Unpaid Principal Balance                    $       581,049.78
Second Unpaid Principal Balance                      12,259.86
Interest as of 02-11-14                              11,089.52
(Second) Interest as of 02-11-14                           .00
  Escrow Overdraft                                   10,123.85
  Unpaid Late Charges                                   226.98
TOTAL AMOUNT DUE UNDER NOTE/SECURITY INSTRUMENT   $  614,749.99
2.  ADDITIONAL CONTRACTUAL AND OTHER FEES AND CHARGES DUE
Recording Costs                                          18.00
Fax Fee                                                    .00
Property Inspection                                       .00
Obligation Fee                                          30.00
Buydown/Corp Subsidy                                      .00
Atty Fees And Costs                                    926.00
TOTAL CONTRACTUAL AND OTHER FEES AND CHARGES DUE  $     974.00
TOTAL AMOUNT DUE through 02-11-14                 $  615,723.99

EX 1 pg 2 of 2

12

# EXHIBIT "2"

B 10 (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT Central District Of California | PROOF OF CLAIM |
|---|---|

| Name of Debtor: ROBERT ALGOT WINBERG | Case Number: 14-12076 | |
|---|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
JP MORGAN CHASE BANK, National Association, successor in interest by purchase from the FDIC as Receiver of Washington Mutual Bank

Name and address where notices should be sent:
JP MORGAN CHASE BANK, National Association, successor in interest by purchase from the FDIC as Receiver of Washington Mutual Bank
c/o LCS Financial Services Corporation
6782 South Potomac Street, Suite 100
Centennial, CO 80112
Telephone number: (866) 662-9087                email.

**COURT USE ONLY**

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number:_____
    (If known)

Filed on:_____

Name and address where payment should be sent (if different from above):



Telephone number:                email.

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

1. Amount of Claim as of Date Case Filed: $  $197,901.94_____

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim:   Mortgage
(See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: 8213 | 3a. Debtor may have scheduled account as: (See instruction #3a) | 3b. Uniform Claim Identifier (optional): (See instruction #3b) |
|---|---|---|

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☒Real Estate ☐Motor Vehicle ☐Other
Describe: 1481 E COVINA HILLS RD  COVINA , CA 91724-3623

Value of Property: $_____

Annual Interest Rate _0_% ☒Fixed or ☐Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
                $  $11,874.06_____

Basis for perfection:_____

Amount of Secured Claim: $  $197,901.94

Amount Unsecured:        $_____

5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B)

☐Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Wages, salaries, or commissions (up to 11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(_).

Amount entitled to priority:
$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

6. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

---

**8. Signature:** (See instruction #8)
Check the appropriate box.

☐ I am the creditor.     ☒ I am the creditor's authorized agent.     ☐ I am the trustee, or the debtor,     ☐ I am a guarantor, surety, endorser, or other codebtor.
(Attach copy of power of attorney, if any.)     or their authorized agent     (See Bankruptcy Rule 3005.)
(See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name:    Debra Engh
Title:    Director of Bankruptcy
Company:    LCS Financial Services Corp.
Address and telephone number (if different from notice address above).

_(Signature)_    _Debra Engh_    _2/24/14_    _(Date)_

Telephone number:    email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. § 506 (a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507 (a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court

16

EX 2 pg 3 of 16

B 10A (Attachment A) (12/11)

# Mortgage Proof of Claim Attachment

If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See Bankruptcy Rule 3001(c)(2).

| | |
|---|---|
| **Name of debtor:** ROBERT ALGOT WINBERG | **Case number:** 14-12076 |
| **Name of creditor:** JP MORGAN CHASE BANK, National Association, successor in interest by purchase from the FDIC as Receiver of Washington Mutual Bank | **Last four digits of any number you use to identify the debtor's account:** 8213 |

## Part 1: Statement of Principal and Interest Due as of the Petition Date

Itemize the principal and interest due on the claim as of the petition date (included in the Amount of Claim listed in Item 1 on your Proof of Claim form).

1. Principal due ............................................................................................................. (1) $197,901.94

2. Interest due

| Interest rate | From mm/dd/yyyy | To mm/dd/yyyy | Amount |
|---|---|---|---|
| 0% | 09-01-12 | 02-03-14 | $0.00 |
| _____ % | _____ | _____ | $ _____ |
| _____ % | _____ | _____ | + $ _____ |

Total interest due as of the petition date    $ _____    Copy total here ▶ + (2) + $0.00

3. Total principal and interest due ............................................................................. (3) $197,901.94

## Part 2: Statement of Prepetition Fees, Expenses, and Charges

Itemize the fees, expenses, and charges due on the claim as of the petition date (included in the Amount of Claim listed in the Proof of Claim form).

| Description | Dates Incurred | Amount |
|---|---|---|
| 1. Late charges | _____ | (1) $ _____ |
| 2. Non-sufficient funds (NSF) fees | _____ | (2) $ _____ |
| 3. Attorney's fees | _____ | (3) $ _____ |
| 4. Filing fees and court costs | _____ | (4) $ _____ |
| 5. Advertisement costs | _____ | (5) $ _____ |
| 6. Sheriff/auctioneer fees | _____ | (6) $ _____ |
| 7. Title costs | _____ | (7) $ _____ |
| 8. Recording fees | _____ | (8) $ _____ |
| 9. Appraisal/broker's price opinion fees | _____ | (9) $ _____ |
| 10. Property inspection fees | _____ | (10) $ _____ |
| 11. Tax advances (non-escrow) | _____ | (11) $ _____ |
| 12. Insurance advances (non-escrow) | _____ | (12) $ _____ |
| 13. Escrow shortage or deficiency (Do not include amounts that are part of any installment payment listed in Part 3.) | _____ | (13) $ _____ |
| 14. Property preservation expenses. Specify: _____ | _____ | (14) $ _____ |
| 15. Other. Specify: _____ | _____ | (15) $ _____ |
| 16. Other. Specify: _____ | _____ | (16) $ _____ |
| 17. Other. Specify: _____ | _____ | (17) + $ _____ |

18. Total prepetition fees, expenses, and charges. Add all of the amounts listed above. .......... (18) $ _____

B 10S (Attachment A) (12/11)                                                                              Page 2

## Part 3: Statement of Amount Necessary to Cure Default as of the Petition Date

Does the installment payment amount include an escrow deposit?

☑ No

☐ Yes    Attach to the Proof of Claim form an escrow account statement prepared as of the petition date in a form  consistent with
applicable nonbankruptcy law.

1.  Installment          Date last payment received by creditor      __09-01-12__
    payments due                                                      mm/dd/yyyy

                         Number of installment payments due      (1)    __18__

2.  Amount of installment    __18_____ installments @         __$659.67_____
    payments due
                         _____installments @              $ _____

                         _____installments @            + $ _____

                         Total installment payments due as of
                         the petition date                    __$11,874.06__

                                                    Copy total here ▶  (2) __$11,874.06__

3.  Calculation of      Add total prepetition fees, expenses, and charges    Copy total from
    cure amount                                                              Part 2 here ▶  + __$0.00_____

                         Subtract total of unapplied funds (funds received but not credited
                         to account)                                     - $ _____

                         Subtract amounts for which debtor is entitled to a refund    - $ _____

                         Total amount necessary to cure default as of the petition date    (3) __$11,874.06_____

                                                    Copy total onto Item 4 of Proof of
                                                    Claim form

**Washington Mutual**

# WaMu Equity Plus™
## AGREEMENT AND DISCLOSURE

This    WaMu Equity Plus(TM)    Agreement and Disclosure ("Agreement") governs your home equity line of credit account (the "Credit Line") issued by the Bank identified below and secured by the property at the address identified below. In this Agreement, we use the words "Borrower", "you" and "your" to mean each and all of the persons who sign this Agreement. The words "we," "us" and "our" mean the Bank or any successor or assign. The word "Card" means each credit card that can be used to obtain advances on the Credit Line, whether in the form of purchase transactions, cash advances or otherwise. A Card will be issued only if so indicated in Section I below. Our "business days" are Mondays through Fridays, but federal legal public holidays are excluded. You should read all of this Agreement, but for your convenience, we have set forth some of the rate, payment and fee information on the first two pages. You and we agree as follows:

## I.    GENERAL INFORMATION:

| Borrower(s): | | |
|---|---|---|
| ROBERT ALGOT WINBERG | SUSAN M WINBERG | |
| **Bank:** WASHINGTON MUTUAL BANK | **Date of Agreement:** 08/14/2007 | **Account Number:** |
| **Credit Limit:** $250,000.00 | **Maturity Date:** 08/18/2037 | **Initial Draw Period:** 120 Months |
| **Property Address:** 1481 E COVINA HILLS RD COVINA, CA 91724-3623 | | |

| | |
|---|---|
| **Effective Disbursement Date:** 08/18/2007 The date on and after which you may begin to receive credit "advances" ("advances") from your Credit Line. This will be a date we specify, which shall follow the expiration of any rescission period required by law, our acceptance of this Agreement, and your meeting of all conditions for the Credit Line. | **Card Access:** You ☒ will  ☐ will not receive a Card to access your Credit Line. If you will not have Card access, the terms and conditions in this Agreement regarding the Card will not be applicable. |

Discounts: The ANNUAL PERCENTAGE RATE used to calculate the periodic FINANCE CHARGES you pay may be discounted based on your other relationships with the Bank and on whether you authorize payments by our Auto Pay service. The available discounts shown in Table A below are explained in Section VI B(c). The specific discount amounts and discounted rates are shown in Tables B and C below.

### Table A - Discounts

| Type of Discount | No. of Accounts Required | Minimum Balance Required | Currently Eligible for Discount |
|---|---|---|---|
| Auto Pay Authorization | 1 | $0.00 | Yes |
| Account Relationships | 1 | $50,000.00 | Yes |
| First Mortgage Relationship | 1 | $0.00 | No |

Payments:  Send payments to
WASHINGTON MUTUAL BANK
CONSUMER LENDING -- BR2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or, if a different address is stated in the Periodic Statement, send payments to that address.

## II.    VARIABLE RATE ADVANCES:

Variable Rate Index:  The Daily Periodic Rate and ANNUAL PERCENTAGE RATE on your Credit Line are subject to change daily based on changes in the "Variable Rate Index", which is the highest "Prime Rate" most recently published in the "Money Rates" table of The Wall Street Journal.

Variable Rate Margin:  _0.850_ % (Does not include any discounts shown in Tables A, B or C)

Maximum Variable Rate:  Daily Periodic Rate _0.049315_ % (ANNUAL PERCENTAGE RATE 18.000 %)
Minimum Variable Rate:  Daily Periodic Rate _0.000000_ % (ANNUAL PERCENTAGE RATE 0.000 %)

Minimum Payment:  For Variable Rate Advances, your minimum monthly payment ("Minimum Payment") during both the Draw Period and any Post Draw Period (defined in Section VI.4 below) will be equal to all accrued and unpaid FINANCE CHARGES, late fees and other fees and charges described below, plus any past due amounts and any outstanding balance of your Credit Line in excess of your Credit Limit.

Special Promotional Rates:  ☐ If this box is checked, then the special Promotional Rates shown in Table B below will apply beginning on the Effective Disbursement Date and continuing until the following Promotional Rate Expiration Date: _N/A_ .

### Table B - Current Rates on Variable Rate Advances

| Number of Discounts | Discount Percentage | Daily Periodic Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate (Promotional Rate) | ANNUAL PERCENTAGE RATE (Promotional Rate) |
|---|---|---|---|---|---|
| No Discounts | 0.000 % | 0.024384 % | 8.900 % | N/A % | N/A % |
| 1 Discount | 0.250 % | 0.023699 % | 8.650 % | N/A % | N/A % |
| 2 Discounts | 0.500 % | 0.023014 % | 8.400 % | N/A % | N/A % |

## III.    FIXED RATE LOAN OPTION ("FRLO"):

Fixed Rate Loan Option Index and Rates:  The FRLO is your option to obtain fixed rate loans ("Fixed Rate Loans") under your Credit Line.  Except as otherwise specified below under "Promotional Rates," if you choose to exercise the Fixed Rate Loan Option, the Daily Periodic Rate and ANNUAL PERCENTAGE RATE will be determined based on the "FRLO Index", which is the highest "Prime Rate" most recently published in the "Money Rates" table of The Wall Street Journal, plus a "FRLO Margin" of _14.0_ %.

Promotional Rates:  We may, at our sole discretion and without prior notice, provide a Fixed Rate Loan at a discounted ANNUAL PERCENTAGE RATE, that is, an ANNUAL PERCENTAGE RATE that is lower than the sum of the FRLO Index plus the FRLO

3 3 3 6 6 (06/14/07) w8.3

Margin stated above. The Daily Periodic Rate will also be reduced. These are called "Promotional Rates." If we provide Promotional Rates, they will be shown in a confirmation form that we provide you. FRLO Promotional Rates will remain in effect for the term of the FRLO.

### Table C - Current Rates on Fixed Rate Loans

| Number of Discounts | Discount Percentage | Daily Periodic Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate (Promotional Rate) | ANNUAL PERCENTAGE RATE (Promotional Rate) |
|---|---|---|---|---|---|
| No Discounts | 0.000 % | 0.049315 % | 18.000 % | 0.023425 % | 8.560 % |
| 1 Discount | 0.250 % | 0.048630 % | 17.750 % | 0.022740 % | 8.300 % |
| 2 Discounts | 0.500 % | 0.047945 % | 17.500 % | 0.022055 % | 8.050 % |

* Rates are examples based on a $50,000 FRLO with an Amortizing Minimum Payment and a Term of five (5) years.

Maximum FRLO Rate:    Daily Periodic Rate    N/A    % (ANNUAL PERCENTAGE RATE    N/A    %)
Minimum FRLO Rate:    Daily Periodic Rate    N/A    % (ANNUAL PERCENTAGE RATE    N/A    %)

**FRLO Confirmation:** ☐ If this box is checked, you have chosen to exercise your option to obtain a Fixed Rate Loan on the Effective Disbursement Date. (If you have chosen to obtain a second Fixed Rate Loan on the Effective Disbursement Date, you must complete a separate form that we will provide to you upon request.) The terms of your Fixed Rate Loan will be as follows:

| Type: | FRLO Sub-Account No.: N/A | Amount: N/A |
|---|---|---|
| Transaction Fee: There is no Fixed Rate Loan Option Fee for any Fixed Rate Loan obtained upon opening the Credit Line. | Daily Periodic Rate: N/A | Term: N/A Months |
| Buydown Fee (FINANCE CHARGE): __N/A__ (Equal to __N/A__ % of the Fixed Rate Loan Amount | ANNUAL PERCENTAGE RATE: N/A | N/A % |
| Minimum Payment N/A | | |

**Payment Method:**
☐ You have elected to make your Fixed Rate Loan payments by payment coupon or billing statement. If you do not receive your payment coupon or billing statement before your first payment is due, please send your payment, including your FRLO sub-account number (if any), to:
WASHINGTON MUTUAL BANK
CONSUMER LENDING – BH2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or you may make your payment at any Washington Mutual Financial Center.

☐ You have elected to make your Fixed Rate Loan payments by our Auto Pay service. You will need to sign a separate Auto Pay Automatic Loan Payment Authorization Form.

**How to Get a Fixed Rate Loan After Closing:** Call 1-888-800-8738 toll-free (for TDD, call 800-735-2922) or, if a different telephone number is stated in the Periodic Statement, call that telephone number.

### Table D - Fixed Rate Loan Terms

| Type of Minimum Payment | Fixed Rate Loan Dollar Amount | Maximum Permissible Term |
|---|---|---|
| Amortizing Minimum Payment | Up to $19,999.99 | Up to 120 months (10 years). If the Term extends beyond the Maturity Date, the principal amount will not fully amortize, and the remaining principal will be due and payable in full on the Maturity Date. |
| Amortizing Minimum Payment | $20,000.00 or more | Up to __240__ months (__20__ years). If the Term extends beyond the Maturity Date, the principal amount will not fully amortize, and the remaining principal will be due and payable in full on the Maturity Date. |
| Interest Only Minimum Payment | Any amount | 3, 5, 7 or 10 years, but the term must conclude before the Maturity Date |

## IV. FEES AND CHARGES:

**FINANCE CHARGES and Other Fees and Charges at Closing:** You agree to pay the following FINANCE CHARGES and other fees and charges, which will be charged to your Credit Line on the Effective Disbursement Date unless paid to us on or before that date. Periodic FINANCE CHARGES will begin to accrue immediately on those amounts if charged to your Credit Line.

**FINANCE CHARGES:**                    Other Fees and Charges:

* These items will be paid by the Bank and charged to your Credit Line.

Additional FINANCE CHARGES: You agree to pay the following additional FINANCE CHARGES:

**Cash Advance Fee.** A cash advance fee FINANCE CHARGE of 2.00% of each cash advance obtained on this Card, or $2.00, whichever is greater.

**Fee for Small Variable Rate Advance.** If, at our sole option, we elect to honor a request for a Variable Rate Advance of less than $100.00, a transaction FINANCE CHARGE of 4.00% of the amount of the advance. This FINANCE CHARGE will not be imposed for Card transactions.

**Fee for Lien Subordination.** If, at our sole option, we agree to subordinate the lien of the Security Instrument, a transaction FINANCE CHARGE of __$50.00 - $250.00__.

3 3 3 6 6 (06/14/07) w8.3                    Page 2 of 9

20

EX 2 pg 7 of 16

report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50.00 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases.* If you have a problem

with the quality of property or services that you purchased with a credit card and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or the services. There are two limitations on this right:

   (a)  You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

   (b)  The purchase price must have been more than $50.00.

These limitations do not apply if we own or operate the merchant or if we mailed you the advertisement for the property or services.

## SIGNATURES

By signing below, you agree to the terms of this Agreement and you acknowledge that you have read and received a copy of this Agreement.

ROBERT ALGOP WINBERG

SUSAN M WINBERG

Pay to the order of
Without Recourse
Washington Mutual Bank

Cynthia A. Riley, Vice President




**This page is part of your document - DO NOT DISCARD**

 **20072090931**    Pages: 009


ORIGINAL DEED



Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

09/11/07 AT 08:01AM

Fee: 34.00
Tax: 0.00
Other: 0.00
Total: 34.00

1125948    200709110150001    Mail

## TITLE(S):




L E A D    S H E E T



Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.    Number of AIN's Shown

    **THIS FORM IS NOT TO BE DUPLICATED**    

Recording requested by and

**When Recorded Mail to:**
Optima Information Solutions
3 First American Way
Santa Ana, CA 92707
WAMU                                    ONS

09/11/07



20072090931

 **Washington Mutual**

WaMu Equity Plus™
**DEED OF TRUST**
Loan Number:

THIS DEED OF TRUST is between:
ROBERT ALGOT WINBERG AND SUSAN M. WINBERG

whose address is:
            1481 E COVINA HILLS RD  COVINA, CA 91724-3623
("Trustor");    CALIFORNIA RECONVEYANCE COMPANY            a        CALIFORNIA
corporation, the address of which is:
            9200 OAKDALE AVENUE  CHATSWORTH, CA 91311
and its successors in trust and assigns ("Trustee"); and
WASHINGTON MUTUAL BANK, A FEDERAL ASSOCIATION, WHICH IS ORGANIZED AND
EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND WHOSE ADDRESS IS
2273 N GREEN VALLEY PARKWAY, SUITE #14, HENDERSON, NV 89014 ("BENEFICIARY") AND
ITS SUCCESSORS OR ASSIGNS.
    1.  Granting Clause.  Trustor hereby grants, bargains, sells and conveys to Trustee in
trust, with power of sale, the real property in _____ LOS ANGELES _____ County, California,
described below and all interest in it Trustor ever gets:
SHOWN ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF BY THIS
REFERENCE.

Tax Parcel Number:_____ 8447-005-030 _____ together with all
insurance and condemnation proceeds related to it; all plumbing, lighting, air conditioning and
heating apparatus and equipment; and all fencing, blinds, drapes, floor coverings, built-in

4 3 6 0 (01/24/07) w8.2                                    Page 1 of 7

appliances and other fixtures at any time installed on or in or used in connection with such real property.

All of the property described above will be called the "Property". As used herein "State" shall refer to the state of California.

2.    **Obligation Secured.** This Deed of Trust is given to secure performance of each promise of Trustor contained herein and in a _____WaMu Equity Plus(TM)_____ Agreement and Disclosure with Beneficiary of even date herewith with a maximum credit limit of _____$250,000.00_____ (the "Credit Agreement"), including any extensions, renewals or modifications thereof, and repayment of all sums borrowed by Trustor under the Credit Agreement, with interest from the date of each advance until paid at the rates provided therein. The Credit Agreement provides for variable and fixed rates of interest. Under the Credit Agreement, the Trustor may borrow, repay and re-borrow from time to time, up to the maximum credit limit stated above, and all such advances shall be secured by the lien of this Deed of Trust. This Deed of Trust also secures payment of certain fees and charges payable by Trustor under the Credit Agreement, certain fees and costs of Beneficiary as provided in Section 9 of this Deed of Trust, and repayment of money advanced by Beneficiary to protect the Property or Beneficiary's interest in the Property, including advances made pursuant to Section 6 below. The Credit Agreement provides that unless sooner repaid, all amounts due under the Credit Agreement are due and payable in full thirty (30) years from the date of this Deed of Trust (the "Maturity Date"). All amounts due under the Credit Agreement and this Deed of Trust are called the "Debt".

3.    **Representations of Trustor.** Trustor represents that:

(a)    Trustor is the owner of the Property, which is unencumbered except by: easements, reservations, and restrictions of record not inconsistent with the intended use of the Property and any existing first mortgage or deed of trust given in good faith and for value, the existence of which has been disclosed in writing to Beneficiary; and

(b)    The Property is not presently and will not during the term of this Deed of Trust be used for any agricultural purposes.

4.    **Promises of Trustor.** Trustor promises:

(a)    To keep the Property in good repair and not to remove, alter or demolish any of the improvements on the Property, without first obtaining Beneficiary's written consent;

(b)    To allow representatives of Beneficiary to inspect the Property at any reasonable hour, and to comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the Property;

(c)    To pay on time all lawful taxes and assessments on the Property;

(d)    To perform on time all terms, covenants and conditions of any prior mortgage or deed of trust covering the Property or any part of it and pay all amounts due and owing thereunder in a timely manner;

(e)    To see to it that this Deed of Trust remains a valid lien on the Property superior to all liens except those described in Section 3(a), and to keep the Property free of all encumbrances which may impair Beneficiary's security;

(f)    To keep the improvements on the Property insured by a company satisfactory to Beneficiary against fire and extended coverage perils, and against such other risks as Beneficiary may reasonably require, in an amount equal to the full insurable value of the improvements, and to deliver evidence of such insurance coverage to Beneficiary. Subject to the rights of the holder of any lien described in 3(a), Beneficiary shall be named as the loss payee on all such policies pursuant to a standard lender's loss payable clause. The amount collected under any insurance policy shall

4 3 6 0 (01/24/07) w8.2                                                        Page 2 of 7

7

By signing below Trustor accepts and agrees to the provisions of this Deed of Trust and of any rider(s) executed by Trustor concurrently therewith.

DATED at _COVINA_, _CA_ this _14th_ day of _AUGUST 2007_

TRUSTOR(S):

_____
ROBERT ALGOT WINBERG

_____
SUSAN M WINBERG

4 3 6 0 (01/24/07) w8.2                                    Page 6 of 7

STATE OF CALIFORNIA

COUNTY OF _LOS ANGELES_

On __8/14/07__ before me, _GILBERT TIU_ , Notary Public,

(here insert name)

personally appeared
ROBERT ALGOT WINBERG
SUSAN M WINBERG

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.                    (Seal or Stamp)

Signature: _Gilbert Tiu_
My Commission expires: _NOV. 10, 2007_
My Commission number: _1450483_

> GILBERT TIU
> Commission # 1450483
> Notary Public - California
> Los Angeles County
> My Comm. Expires Nov 10, 2007

## REQUEST FOR FULL RECONVEYANCE
Do not record. To be used only when Trustor's
indebtedness has been repaid and Credit Agreement cancelled.

TO: TRUSTEE _____

The undersigned is Trustee of the within Deed of Trust, and the legal owner and holder of the ___WaMu Equity Plus(TM)___ Agreement secured thereby. Said Deed of Trust is hereby surrendered to you for reconveyance and you are requested, upon payment of all sums owing to you, to reconvey, without warranty, to the person(s) entitled thereto, the right, title and interest now held by you thereunder.

DATE: _____

                    WASHINGTON MUTUAL BANK _____

            By _____

            Its _____

4 3 6 0 (01/24/07) w8.2                                        Page 7 of 7

EXHIBIT "A"
ATTACHMENT TO SECURITY INSTRUMENT

THE FOLLOWING DESCRIBED PROPERTY LOCATED IN THE CITY OF COVINA,
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS
FOLLOWS:
THAT PORTION OF LOT 3 OF THE CHAFFEY TRACT, IN THE CITY OF
COVINA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 59 PAGE 14 OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT IN THE NORTHERLY LINE OF COVINA HILLS ROAD
(FORMERLY POMONA AND COVINA ROAD) AS SHOWN ON SAID MAP WHICH IS
NORTH 67 DEGREES 36 MINUTES 35 SECONDS WEST 265.41 FEET AND
SOUTH 83 DEGREES 16 MINUTES 45 SECONDS WEST 947.46 FEET FROM THE
SOUTHEASTERLY CORNER OF SAID LOT 3; THENCE ALONG THE WESTERLY
LINE OF THE LAND CONVEYED TO JAMES D. RYAN, ET UX, BY DEED
RECORDED ON JULY 12, 1960 AS INSTRUMENT NO. 2174 IN BOOK D907
PAGE 449 OF OFFICIAL RECORDS OF SAID COUNTY, NORTH 6 DEGREES 43
MINUTES 15 SECONDS WEST 309.95 FEET TO THE NORTHWESTERLY CORNER
OF SAID LAND; THENCE SOUTH 83 DEGREES 16 MINUTES 14 SECONDS WEST
61.40 FEET; THENCE SOUTH 38 DEGREES 16 MINUTES 45 SECONDS WEST
68.73 FEET; THENCE SOUTH 6 DEGREES 43 MINUTES 15 SECONDS EAST
261.40 FEET TO SAID NORTHERLY LINE OF COVINA HILLS ROAD; THENCE
ALONG SAID NORTHERLY LINE, NORTH 83 DEGREES 16 MINUTES 45
SECONDS EAST TO THE POINT OF BEGINNING.

3 1 5 7 8 (01/25/07) w8.2

Page 1

## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that JPMorgan Chase Bank, N.A. (the "Bank"), a national banking association organized and existing under the laws of the United States, and having its principal place of business at 270 Park Avenue, New York, New York, 10017-2014, pursuant to that certain Servicing Agreement dated May 31, 2012 "Agreement", hereby constitutes and appoints LCS Financial Services Corporation, a Colorado corporation, ("Servicer"), by and through its officers, the Bank's true and lawful Attorney-in-Fact, in the Bank's name, place and stead and for the Bank's benefit, in connection with all mortgage loans serviced by Servicer pursuant to the Agreement solely for the purpose of performing such acts and executing such documents in the name of the Bank, necessary and appropriate to effectuate the following enumerated transactions in respect of any of the mortgages or deeds of trust (the "Mortgages" and the "Deeds of Trust" respectively) and promissory notes secured thereby (the "Mortgage Notes") for which the undersigned is acting on its own behalf or on behalf of various investors (whether the undersigned is named therein as mortgagee or beneficiary or has become mortgagee by virtue of endorsement of the Mortgage Note secured by any such Mortgage or Deed of Trust) and for which Servicer is servicing the Mortgage Notes and Mortgages.

This Appointment shall apply only to the following enumerated transactions and nothing herein or in the Agreements shall be construed to the contrary:

    1.    The preparation, signing and filing of Proofs of Claim ("POCs") in Bankruptcy Court based upon personal knowledge.

    2.    The amendment or withdrawal of POCs as necessary and appropriate.

    3.    The execution of stipulations as necessary and appropriate to protect the interests of the Bank with regard to bankrupt accounts.

The undersigned gives said Attorney-in-Fact full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully as the undersigned might or could do, and hereby does ratify and confirm to all that said Attorney-in-Fact shall do effective as of March 1, 2012.

This appointment is to be construed and interpreted as a limited power of attorney. The enumeration of specific items, rights, acts or powers herein is not intended to, nor does it give rise to, and is not to be construed as a general power of attorney.

This Limited Power of Attorney is entered into and shall be governed by the laws of the State of New York, without regard to conflicts of law principles of such state.

Third parties without actual notice may rely upon the exercise of the power granted under this Limited Power of Attorney; and may be satisfied that this Limited Power of Attorney shall

    :

28

EX 2 pg 15 of 16

continue in full force and effect and has not been revoked unless an instrument of revocation has been made in writing by the undersigned

IN WITNESS WHEREOF. JPMorgan Chase Bank, N.A. has caused this Limited Power of Attorney to be signed and acknowledged in its name and on its behalf by a duly elected and authorized officer this ___ day of January, 2013.

JPMorgan Chase Bank, N.A.

By_____
Steven D. Hemperly
Senior Vice President

## CORPORATE ACKNOWLEDGMENT

State of Texas

County of Dallas

On this _____ day of January, 2013, before me, the undersigned, a Notary Public in and for the State of Texas, personally appeared Steven D. Hemperly, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed the foregoing instrument as Senior Vice President of JPMorgan Chase Bank, N.A., a national banking association named, and acknowledged to me that such national banking association executed the foregoing instrument pursuant to its by-laws or a resolution of its Board of Directors.

WITNESS my hand and official seal.

_____
Notary Public

(NOTARY SEAL)

VICKIE S. GILMORE
My Commission Expires
June 9, 2015

2

29

EX 2 pg 16 of 16

# EXHIBIT "3"

| UNITED STATES BANKRUPTCY COURT | FOR THE CENTRAL DISTRICT OF CALIFORNIA<br>LOS ANGELES DIVISION | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>    Robert Algot Winberg<br>    *Aka* Robert A Winberg | Case Number:<br>  2:14-bk-12076-JWB | |

**NOTE:** *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*
*You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>OneWest Bank, FSB | |
|---|---|
| | **COURT USE ONLY** |
| Name and address where notices should be sent:<br>  OneWest Bank, FSB<br>  P.O. Box 829009<br>  Dallas, Texas 75382-9009<br><br>  Telephone Number: (800) 781-7399    email: | ☐ Check this box if this claim amends a previously filed claim.<br><br>Court Claim Number: _____<br><br>  *(If Known)*<br><br>  *Filed on* _____ |
| Name and address where payment should be sent: (if different from above):<br>  OneWest Bank, FSB<br>  Cashiering Department<br>  6900 Beatrice Drive<br>  Kalamazoo, Michigan 49009<br><br>  Telephone Number: (800) 781-7399    email: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars. |

**1. Amount of Claim as of Date Case Filed:**      $93,686.87

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☒ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

| **2. Basis for Claim:**      Money Loaned<br>(See instruction #2) |
|---|

| **3. Last four digits of any number by which the creditor identifies debtor:**   xxxxxx7295 | **3a. Debtor may have scheduled account as:**<br><br>(See instruction #3a) | **3b. Uniform Claim Identifier (optional):**<br><br>(See instruction #3b) |
|---|---|---|

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien or property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of Property or right of setoff:** ☒ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:**     1481 East Covina Hills Rd, Covina, California 91724

**Value of Property:** _____

**Annual Interest Rate:**  0.00%  ☐ Fixed or ☒ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

    $16,658.85

**Basis for perfection:**   Recordation of Lien

**Amount of Secured Claim:**   $93,686.87

**Amount of Unsecured:** _____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier - 11 U.S.C. §507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

**Amount entitled to priority:**

_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family or household use - 11 U.S.C. §507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a) (__).

*Amounts are subject to adjustment on 04/01/2016 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10Form_Ver001 : 6508-N-8398

EX 3 pg 1 of 32

B 10 (Official Form 10) (04/13)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted.")*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.    ☒ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor,    ☐ I am a guarantor, surety, indorser, or other
(See Bankruptcy Rule 3004.)    codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:    John J. Rafferty
Title:    Authorized Agent for OneWest Bank, FSB
Company:    Buckley Madole, P.C.    /s/ John J. Rafferty
                                      Signature

Address and telephone number (if different from notice address above):    02/17/2014
    P. O. Box 9013    Date
    Addison, TX 75001

Telephone:    (972) 643-6600    Email:    POCInquiries@BuckleyMadole.com

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

B10Form_Ver001 : 6508-N-8398

EX 3 pg 2 of 32

32

B 10 (Attachment A) (12/11)
Chapter: 13

FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION
Judge: Julia W. Brand        Trustee: Nancy K. Curry.

## Mortgage Proof of Claim Attachment

**If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim.  See Bankruptcy Rule 3001(c)(2).**

| | | | |
|---|---|---|---|
| **Name of debtor:** | Robert Algot Winberg *Aka* Robert A Winberg | **Case Number:** | 2:14-bk-12076-JWB |
| **Name of creditor:** | OneWest Bank, FSB | **Last four digits of any number you identify the debtor's account:** | xxxxxx7295 |

### Part 1: Statement of Principal and Interest Due as of the Petition Date (02/03/2014)

Itemize the principal and interest due on the claim as of the petition date (include in the Amount of Claim listed in item 1 of your Proof of Claim form).

1.  **Principal due**                                                      (1)    **$91,519.28**

2.  **Interest due**

| Interest Rate | From | To | Amount |
|---|---|---|---|
| 3.250% | 10/26/2011 | 06/25/2012 | $1,979.49 |
| 0.000% | 06/26/2012 | 02/03/2014 | $0.00 |

Total interest due as of the  Petition date $1,979.49        Copy total here  **>**   (2)   **+ $1,979.49**

3.  **Total principal and interest due**                                   (3)    **$93,498.77**

### Part 2: Statement of Pre-Petition Fees, Expenses, and Charges

Itemize the fees, expenses, and charges due on the claim as of the petition date (include in the Amount of Claim listed in Item 1 on the Proof of Claim form).

| Description | | Dates incurred | Amount | |
|---|---|---|---|---|
| 1. | Late Charges | | 1 @ $13.85 incurred on 10/11/11<br>1 @ $11.00 incurred on 11/10/11<br>1 @ $12.63 incurred on 12/12/11<br>1 @ $13.04 incurred on 01/10/12<br>1 @ $12.63 incurred on 03/12/12<br>1 @ $12.63 incurred on 04/10/12<br>1 @ $11.82 incurred on 05/11/11 | (1) | $87.60 |
| 2. | Non-sufficient funds (NSF) fees | | | (2) | |
| 3. | Attorney fees | | | (3) | |
| 4. | Filing fees and court costs | | | (4) | |
| 5. | Advertisement costs | | | (5) | |
| 6. | Sheriff/auctioneer fees | | | (6) | |
| 7. | Title costs | | | (7) | |
| 8. | Recording fees | | | (8) | |
| 9. | Appraisal/broker's price opinion fees | | | (9) | |
| 10. | Property inspection fees | | 1 @ $10.50 incurred on 09/20/11<br>1 @ $10.50 incurred on 10/20/11<br>1 @ $10.50 incurred on 11/25/11<br>1 @ $10.50 incurred on 12/21/11<br>1 @ $10.50 incurred on 01/19/12<br>1 @ $10.50 incurred on 02/28/12<br>1 @ $10.50 incurred on 03/20/12<br>1 @ $10.50 incurred on 04/26/12<br>1 @ $10.50 incurred on 05/25/12 | (10) | $94.50 |
| 11. | Tax advances (non-escrow) | | | (11) | |
| 12. | Insurance advances (non-escrow) | | | (12) | |
| 13. | Escrow shortage or deficiency (Do not include amounts that are part of any installment payment listed in Part 3.) | | | (13) | |
| 14. | Property preservation expenses. | Specify: Photos | 1 @ $2.00 incurred on 11/25/11 | (14) | $6.00 |

EXAForm_Ver001
6508-N-8398

3

EX 3  pg 3  of 32

| | Specify: Photos | 1 @ $4.00 incurred on 12/21/11 | | |
|---|---|---|---|---|
| 15. Other. Specify: | | | (15) | |
| 16. Other. Specify: | | | (16) | |
| 17. Other. Specify: | | | (17) | |
| 18. Total prepetition fees, expenses, and charges. Add all of the amounts listed above. | | | (18) | $188.10 |

## Part 3: Statement of Amount Necessary to Cure Default as of the Petition Date

**Does the installment payment amount include an escrow deposit?**

☒ No

☐ Yes. Attach to the Proof of Claim form an escrow account statement prepared as of the **petition date** in a form consistent with applicable nonbankruptcy law.

1. **Installment payments due**    Date last payment received by creditor    02/01/2012

    Number of installment payments due:    (1) 27

2. **Amount of installment payments due**

| | | |
|---|---|---|
| November 2011 to November 2011 | 1 installment @ $252.62 = | $252.62 |
| December 2011 to December 2011 | 1 installment @ $260.77 = | $260.77 |
| January 2012 to January 2012 | 1 installment @ $236.32 = | $236.32 |
| February 2012 to March 2012 | 2 installments @ $252.62 = | $505.24 |
| April 2012 to April 2012 | 1 installment @ $236.32 = | $236.32 |
| May 2012 to June 2012 | 2 installments @ $244.47 = | $488.94 |
| July 2012 to January 2014 | 19 installments @ $762.66 = | $14,490.54 |

Total installment payments due as of the prepetition date    $16,470.75    Copy total here    > (2)    $16,470.75

3. **Calculation of cure amount**

    <u>Add</u> total prepetition fees, expenses, and charges    Copy total here Part 2    >    + $188.10

    <u>Subtract</u> total of unapplied funds (funds received but not credited to account)    $0.00

    <u>Subtract</u> amounts for which debtor is entitled to a refund    _____

    Total amount necessary to cure default as of the petition date    (3)    $16,658.85

    Copy total onto Item 4 of Proof of Claim form

The monthly payment consists of accrued finance charges on the Principal Balance as defined in the attached agreement. As such, ongoing post-petition payments can change each month depending on the account balance during each billing cycle. Please reference the attached agreement for a more detailed breakdown of how monthly charges are calculated. The minimum monthly payment for 02/26/2014 is $762.66.

B10Form_Ver001 : 6508-N-8398

## CERTIFICATE OF SERVICE OF PROOF OF CLAIM

I hereby certify that a true and correct copy of the foregoing document has been served upon the following parties in interest on or before the 17th day of February 2014 via electronic notice unless otherwise stated:

**Debtor** *Via U.S. Mail*
Robert Algot Winberg
1481 E. Covina Hills Road
Covina, CA 91724-3623

**Debtors' Attorney**
Barry E. Borowitz
Borowitz & Clark Llp
100 N BARRANCA ST STE 250
WEST COVINA, CA 91791-1613

**Chapter 13 Trustee**
Nancy K. Curry
700 S Flower Street, Suite 1215
Los Angeles, California 90017

**US Trustee**
Office of the US Trustee
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017

/s/ John J. Rafferty
John J. Rafferty

| | |
|---|---|
| ROBERT ALGOT WINBERG and SUSAN M. WINBERG | INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK |
| | 225 N BARRANCA ST |
| | WEST COVINA, CA 91791 |
| | **Lender's Name and Address** |
| | "We," "us" or "our" means the lender named above. |
| **Address** | No. ▮▮▮▮▮▮ |
| 1481 EAST COVINA HILLS ROAD | Date  September 14, 2007 |
| COVINA, CA 91724 | Credit Limit $  167,800.00 |
| | Draw Period   120 MONTHS |
| **Borrower's Name and Address** | Repayment Period   120 MONTHS |
| "You" or "your" means each borrower above, jointly and severally. | Maturity Date: October 15, 2027 |

## HOME EQUITY LINE OF CREDIT

1.      **GENERALLY:** This agreement (the "Agreement") sets out the terms and conditions of your home equity line of credit (the "Line of Credit" or the "Line of Credit Account"). Many of the terms we use in this Agreement have special meanings:

- The "Line of Credit Account Balance" is the sum of the unpaid principal of loans made under your Line of Credit, plus unpaid but earned finance charges, plus any costs, expenses, and fees that are due.
- The "Credit Limit" is the maximum amount of principal we ordinarily will allow you to owe us under your Line of Credit at any time.
- The "Billing Cycle" means the period of time normally covered by monthly periodic statements and includes such period of time even when a statement is not sent because there is no balance on your Line of Credit Account for that period.
- An "Equity Card" is any credit card we issue to allow you to obtain advances on your Line of Credit.
- The "Draw Period" is the period during which you may request advances on your Line of Credit.
- The "Repayment Period" is the period during which you must repay your Line of Credit Account Balance and may not request further advances.

If any term of this Agreement violates any law or for some other reason is not enforceable, the term will not be part of this Agreement.

2.      **PROMISE TO PAY:** You promise to pay to us, or our order, the total principal of all loans made under your Line of Credit, together with all finance charges, costs, expenses, and fees for which you are responsible under this Agreement. If there is more than one of you, each is jointly and severally liable on this Agreement. This means that we can require any one of you to pay all amounts due under this Agreement, including loans made to any of you, even if in excess of the authorized Credit Limit. Each of you authorizes any other Borrower, on his or her request alone, to cancel the Line of Credit, request and receive advances of principal under your Line of Credit, and to do all actions in connection with the terms of this Agreement. We can release any of you from responsibility under this Agreement, and the others will remain fully responsible hereunder.

3.      **TAX DEDUCTIBILITY:** You understand that we (including our employees and representatives) do not make any representations or warranties to you about the tax consequences -- including the deductibility of interest or fees -- of you establishing or using this Line of Credit, and we will not be liable if interest or fees are not deductible. You should consult a tax advisor regarding the deductibility of interest and charges under your Line of Credit.

4.      **REQUESTING A LOAN:** During the Draw Period, you may request a loan under your Line of Credit by the following methods:

- You write a special check that we have given you for this purpose (the "Equity Check").
- You use an Equity Card for purchase transactions or cash advances.
- You authorize us to pay a designated third person or account.

You may not obtain advances under the Line of Credit until any rescission period provided by federal law has expired and we are reasonably satisfied that none of the persons entitled to rescind had rescinded this Agreement and the Line of Credit.

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay

EX 3  pg 6  of 32

When you request a loan, we will advance exactly the amount you request. The smallest amount we will advance to you when you use an Equity Check is $ _____250.00_____ (the "Minimum Advance"). We will make the advance by depositing the amount in your transaction account, by advancing the money directly to you, or by paying a designated third person or account, depending on how we agree to make the advance. We will record the amount as a loan in your Line of Credit Account.

If you request a loan by writing an Equity Check for less than the Minimum Advance, we may, at our option, grant the request. However, granting the request does not mean we will be required to grant requests for less than the Minimum Advance in the future. We always have the option to deny any such request.

By signing below, each of you request that we issue each of you an Equity Card. Your use of this Equity Card at automated teller machines is subject to our rules relating to automated teller machine transactions.

We will not ordinarily grant any request for a loan that would cause the unpaid principal balance of your Line of Credit Account to be greater than the Credit Limit listed in this Agreement. We may, at our option, grant such a request without obligating ourselves to do so in the future.

Loans under your Line of Credit may be for any lawful purpose, except that you may not use such loans to pay amounts due on your Line of Credit Account. You will notify us immediately in the event any of your Equity Checks or any of your Equity Cards are lost or stolen.

5.      **HOW PERIODIC FINANCE CHARGES ARE COMPUTED:** Finance charges begin to accrue immediately when we make a loan to you. To figure the finance charge for a Billing Cycle, we apply a daily periodic rate of finance charge to the "average daily balance" of your Line of Credit Account for the Billing Cycle. We then multiply that figure by the number of days in the Billing Cycle. The average daily balance is computed as follows. First we take your Line of Credit Account Balance at the beginning of each day and subtract any unpaid finance charges that are due. Next, we subtract the portion of any payments or credits received that day that apply to the repayment of your loans. (A portion of each payment you make is applied to finance charges.) Then we add any new loans made that day. This gives us the daily balance. Then we add up all the daily balances for the Billing Cycle and divide the total by the number of days in the Billing Cycle. This gives us the "average daily balance."

Until the end of the _____1st_____ Billing Cycle after the date of this Agreement (the "Initial Rate Period"), the daily periodic rate of FINANCE CHARGE is _____0.023288_____ % which corresponds to an ANNUAL PERCENTAGE RATE of _____8.500_____ %. The annual percentage rate corresponding to the periodic rate includes interest and not other costs.

The periodic rate and corresponding annual percentage rate described above are the initial rates assessed under this Line of Credit, and are not based on the formula used for later rate adjustments. Had these rates been based on that formula, the daily periodic rate of FINANCE CHARGE would have been _____0.023288_____ %, which corresponds to an ANNUAL PERCENTAGE RATE of _____8.500_____ %. At the end of the Initial Rate Period specified above, the rates will be subject to further adjustments and limitations, as described below under the heading **Variable Rate.**

6.      **VARIABLE RATE:** The "annual percentage rate" referred to in this section is the annual rate that corresponds to the periodic rate applied to the balance as described above. The annual percentage rate may change, and will be _____250/1000ths_____ percentage points ( _____0.250_____ ) above the following "base rate:" the highest base rate on corporate loans posted at large U.S. money center commercial banks as published in the Money Rates table of The Wall Street Journal as the Prime Rate. The annual percentage rate may increase if this "base rate" increases. An increase will take effect on the first day of the Billing Cycle. An increase will result in an increase in the finance charge and it may have the effect of increasing your periodic minimum payment. The annual percentage rate will not increase more often than once a month. A decrease will have the opposite effect of an increase described above.

**Indymac Bank**
**Multistate HELOC Agreement - I/O Min Pay**

Page 2 of 9

1064
03/06

37

EX 3 pg 7 of 32

If the base rate changes more frequently than the annual percentage rate, we will always use the base rate in effect on the day we adjust the annual percentage rate to determine the new annual percentage rate. In such a case, we will ignore any changes in the base rate that occur between annual percentage rate adjustments.

This corresponding **ANNUAL PERCENTAGE RATE** will never exceed 18%, and will never exceed the highest allowable rate for this type of Agreement as determined by applicable state or federal law.

See the Fee Schedule attached hereto and made a part hereof for **additional finance charges and other charges on your Line of Credit.**

7.  **MONTHLY PAYMENTS:** We will send you a periodic statement for each Billing Cycle in which there is a balance owing under your Line of Credit, or a credit balance, or a finance charge is imposed. The periodic statement will show, among other things, the amount of the minimum monthly payment (the "Minimum Payment") and the date by which it is due. You must pay us at least the Minimum Payment indicated on the periodic statement by the date indicated on the statement.

During the Draw Period, the Minimum Payment is the amount, if any, by which your outstanding principal loan balance exceeds your Credit Limit, plus the greater of: (a) $100.00; or (b) the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument, as described below under the heading Security. During the Draw Period the minimum payment may not fully repay the principal that is outstanding on your Line of Credit.

During the Repayment Period, the Minimum Payment is the amount, if any, by which your outstanding principal loan balance exceeds your Credit Limit, plus: (a) the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument; and (b) _____.8333_____ % of the principal balance outstanding on the last day of the Draw Period.

If your Minimum Payment includes any other items authorized by this Agreement, we will so advise you, and the periodic statement will include an itemization of such amounts.

You must send all payments to our attention at the address indicated on the periodic statement.

**FINAL PAYMENT:** On the maturity date listed in this Agreement, you must pay the amount of any remaining Line of Credit Account Balance outstanding. The minimum payments may not be sufficient to fully repay the principal that is outstanding on your Line of Credit. If they are not, you will be required to pay the entire outstanding balance in a single balloon payment.

We are not obligated to refinance your loan at that time, but will consider your request to do so. If you refinance this account at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain financing from us.

8.  **ADDITIONAL REPAYMENT TERMS:** If your Line of Credit Account Balance on a payment date is less than the amount of the Minimum Payment, your minimum monthly payment will equal the Line of Credit Account Balance.

You can pay off all or part of what you owe at any time. However, so long as you owe any amount you must continue to make your periodic Minimum Payment.

The amounts you pay will be applied first to any fees and charges you owe other than principal and finance charges, then to any finance charges that are due, and finally to principal.

9.  **SECURITY:** We have secured your obligations under this plan by taking a security interest (by way of a separate security agreement, mortgage, deed of trust, or other instrument (the "Security Instrument") dated ____September 14, 2007____ , in the following property, described by item or type (the "Property"):
_1481 EAST COVINA HILLS ROAD, COVINA, CA 91724_

Property securing any other loans that you have with us may also secure this Agreement. You may buy property insurance from anyone you want who is acceptable to us.

**Florida:** The state documentary tax due on this Agreement has been paid on the mortgage securing this indebtedness. You agree to pay additional taxes or other changes to the extent such amounts may be imposed by third parties or government authorities in connection with any event of borrowing under this Line of Credit.

You consent to a continuing writ of garnishment effective with respect to any money, salary, or wages as may be owed to us to the fullest extent permitted by law. This consent is given pursuant to Florida Statutes Section 222.11(2).

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay

Page 3 of 9

1064
03/06

38        EX 3 pg 8 of 32

**Maryland Recordation Tax:** If the entire principal amount of the Line of Credit is not disbursed by us to you upon the execution of this Agreement, you may, at your option, pay Maryland recordation tax on the entire principal amount of the Line of Credit at the time of closing, or you may pay Maryland recordation tax at the time of making of the initial and each future advance from us to you. If you pay the Maryland recordation tax on the entire principal amount of the Line of Credit at the time of closing, your total tax liability will be satisfied, regardless of the amount of any future advances that may subsequently be made by us to you. If, however, you elect to pay the required Maryland recordation tax as advances are made, you have seven (7) days to file with the clerk of the court where the security instrument is recorded a verified statement of the amount of the additional debt incurred as each advance is made, and you must pay the applicable Maryland recordation tax on that additional debt, or you may be penalized by a fine of up to $500.00 or imprisonment of up 6 months for failing to do so as provided in § 14-1012 of the Tax Property Article of the Annotated Code of Maryland.

**North Carolina:** This is an equity line of credit Agreement as defined in Section 45-81 of the North Carolina General Statutes. In accordance with the NCGS Section 75-30, you agree to accept all telephone calls made by us through the use of automatic dialing machines.

**Washington:** If this Agreement is signed by husband or wife, or by two or more unmarried individuals, each irrevocably authorizes us to charge the amount of any Equity Check signed by any one of you against the Line of Credit Account and consents to the use of Property identified in the Security Instrument as security for repayment of all such charges.

10.  **CHANGING TERMS OF THIS AGREEMENT:** Generally, we may not change the terms of this Agreement. However, we may change the terms in the following circumstances:
   - If this is a variable rate plan, we may change the index and margin if the original index described in this agreement becomes unavailable. Any new index will have a historical movement similar to the original, and, together with a new margin, will produce a similar interest rate.
   - We may make changes that you have agreed to in writing.
   - We may make changes that unequivocally benefit you.
   - We may make changes to insignificant terms of this Agreement.
   - If we are required to send notice of a change in terms, we will send the notice to your address listed in this Agreement. (You should inform us of any change in address.)

11.  **YOUR RIGHT TO TERMINATE YOUR RIGHT TO OBTAIN LOANS:**
   **A.  Termination.** You may terminate your right to obtain loans by sending us a written notice that will become effective upon receipt by us. If more than one person signs this Agreement as Borrower, your right to obtain loans may be terminated by written notice pursuant to this paragraph signed by any one or more of such persons. We may also suspend your right to obtain loans pursuant to paragraph fourteen (14) below. You must notify the servicer at the following address or at a different address as required by servicer of your intent to terminate.
   P.O. Box 3038, Evansville, IN 47730

   **B.  Effect of Termination.** Upon termination of your Line of Credit Account, you must continue to pay the minimum payment due on or before each payment due date until all amounts owed under this Agreement are paid in full. However, you may be required to repay all obligations immediately if we exercise our rights under paragraph thirteen (13) below. You must return unused Equity Checks upon termination. You may be required to pay an account termination fee pursuant to the Fee Schedule attached hereto and made a part hereof.

12.  **COSTS OF COLLECTION:** You agree to pay all our costs, including reasonable attorneys' fees, that we incur in legal proceedings to collect or enforce this debt should you be in default.
   **Alabama:** You agree to pay our reasonable and actual attorneys' fees, incurred as a result of your default if the unpaid balance at the time of default exceeds $300.
   **Arkansas:** You agree to pay our reasonable and actual attorneys' fees, not to exceed 10% of the amount of principal and accrued interest, if you are in default.
   **California:** You agree to pay costs actually incurred for recording, mailing, publishing, and posting legally required notices, costs of postponement, not to exceed $50, litigation or trustee sale fees, and attorneys' fees allowed by law.

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay

Page 4 of 9

1064
03/06

EX 3 pg 9 of 32

39

**Colorado, Missouri, New York, North Carolina, Oklahoma, South Carolina:** You agree to pay our reasonable attorneys' fees not in excess of 15% of the unpaid debt after default and referral to an attorney who is not our salaried employee, together with any assessed court costs and legal expenses, to the extent permitted by applicable law.

**Louisiana:** You agree to pay our costs of collection and reasonable attorneys' fees not in excess of twenty-five (25) percent of the unpaid debt after default and referral to an attorney for collection.

**Maine:** You will pay all costs, including reasonable attorneys' fees and legal costs, incurred by us in attempting to collect, or collecting, what is owed from any real estate that secures this Agreement. You will pay all costs except attorneys' fees incurred by us in attempting to collect, or collecting, any amounts owed from personal property securing this Agreement.

**New Hampshire:** You agree to pay all our costs, including reasonable attorneys' fees that we incur in legal proceedings to collect or enforce this debt should you be in default. If you successfully assert a partial defense or set off, or recoupment or counterclaim, the court may reduce the amount of attorneys' fees we may recover from you. If you prevail in any action or defense against us, you may recover the amount of reasonable attorneys' fees from us.

**Wisconsin:** If you default, you agree to pay our statutory fees and charges and statutory attorneys' fees when and to the extent authorized by the Wisconsin Consumer Act. Fees and charges include, but are not limited to, the disposition of any Property under Wis. Stat. Ann. § 422.413, as amended.

13.  **TERMINATION OF LINE FOR CERTAIN DEFAULTS:** We may terminate your Line of Credit Account, require you to pay the entire outstanding balance in one payment, and charge you a termination fee (if provided for in this Agreement) and fees related to the collection of the amount owing, if:

    (1)  You engage in fraud or material misrepresentation in connection with your Line of Credit;

    (2)  You fail to make a payment as required by this Agreement; or

    (3)  Your action or inaction adversely affects the collateral or our rights in the collateral.

In that instance, we may take other action short of termination, such as charging you a fee if you fail to maintain required property insurance and we purchase insurance. In the District of Columbia, the remedy of acceleration is subject to the provisions of D.C. Code Ann. § 28-3312(5).

Even if we choose not to use one of our remedies when you default, we do not forfeit our right to do so if you default again. If we do not use a remedy when you default, we can still consider your actions as a default in the future.

In North Dakota, if permitted by applicable law, this obligation may be the basis for a personal action against the promisor or promisors in addition to other remedies allowed by law.

14.  **SUSPENSION OF CREDIT AND REDUCTION OF CREDIT LIMIT:** We may prohibit you from obtaining additional extensions of credit, or reduce your Credit Limit if:

    (1)  The value of the dwelling securing this home equity Line of Credit declines significantly below its appraised value for purposes of this Line of Credit;

    (2)  We reasonably believe you will not be able to meet the repayment requirements due to a change in your financial circumstances;

    (3)  Your payment history on this home equity Line of Credit is not satisfactory;

    (4)  You are in default of an obligation of this Agreement or any agreement securing this Agreement, which shall include, but is not limited to, your ongoing obligation to supply us with information we feel we need to assess your financial condition;

    (5)  A governmental action prevents us from imposing the annual percentage rate provided for in this Agreement;

    (6)  The action of a governmental body adversely affects our security interest to the extent that the value of the security interest is less than 120% of the home equity Line of Credit;

    (7)  The annual percentage rate corresponding to the periodic rate reaches the maximum rate allowed under this Line of Credit (if provided for in this Agreement); or

    (8)  A regulatory agency has notified us that continued advances would constitute an unsafe and unsound practice.

In the event that we suspend your right to additional advances or reduce your Credit Limit, we will send you notice of our decision at the address listed in this Agreement. (You should inform us of any change in your address.) If we have based our decision to suspend or reduce your credit privileges on an assessment of your financial condition or performance under your Line of Credit, and you believe that your situation has changed, you must request that we re-evaluate your situation, and reinstate your credit privileges.

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay

1064
03/06

Page 6 of 8

40    EX 3 pg 10 of 32

15.  **WAIVERS AND CONSENT:** To the extent not prohibited by law and subject to any required notice and opportunity to cure a default for failure to make a required payment, you waive protest, presentment for payment, demand, notice of acceleration, notice of intent to accelerate and notice of dishonor.

Wisconsin: In addition, subject to Wis. Stat. Ann. § 422.407, as amended, you will not assert any claims or defenses arising out of your Line of Credit against any person to whom we assign our rights under the Line of Credit (the assignee) if the assignee is unrelated to us, acquires the Line of Credit in good faith and for value, gives you a notice of the assignment, and has not received notice from you of your claims or defense within 12 months after the assignee mailed you the notice of assignment.

To the extent permitted by applicable law, you waive your right to the benefit of exemption as to your Property securing, or to secure, this Agreement. If required by law, we will provide you with separate written statement regarding the waiver of your right of exemption. In Indiana, you hereby waive any rights to relief from valuation and appraisement laws.

16.  **REPRESENTATIONS AND WARRANTIES:** You represent and warrant to us that the information contained in the loan application, in each material respect, was true at the time the loan application was completed.

You represent and warrant to us that the terms of any existing Security Instrument on the Property permit us to enter into this Agreement and that the loans secured by such existing deed of trust or mortgage are current in all material respects and are not in default.

17.  **LOAN CHARGES:** If your Line of Credit Account is subject to a law that sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected, or to be collected, in connection with your Line of Credit Account exceeds the permitted limits, then: (a) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from you that exceeded permitted limits will be refunded to you. We will refund such excess either by reducing the principal owed under your Line of Credit Account or by making a direct payment to you. If we apply the excess toward reducing the principal balance, such reduction shall be treated as a partial prepayment hereunder.

18.  **APPLICABLE LAW:** Federal law applies to certain aspects of this Agreement, including, but not limited to, the interest rate and related charges. The law of the state where you and the Property are located will apply to the extent legally required. If any term of this Agreement violates any law or for some reason is not enforceable, or becomes unenforceable, that term will not be part of this Agreement.

If the Lender listed on page one of this Agreement is not IndyMac Bank, F.S.B., the following provisions apply to this Agreement: This is to inform you that your loan is an alternative mortgage loan within the definition of the Federal Alternative Mortgage Transactions Parity Act of 1982 (the "Parity Act") (12 U.S.C. §§ 3801 et seq.) and the implementing regulations adopted by the Office of Thrift Supervision ("OTS") (12 C.F.R. §§ 560.220, referencing, 560.33, 560.34, 560.35 and 560.210). Your loan will be made by us in accordance with the Parity Act requirements of the OTS rather than the provisions of state law. In this regard, pursuant to the authority granted by the Parity Act and the OTS Parity Act regulations, certain state laws will not apply to this loan.

19.  **CREDIT INFORMATION:** You agree to supply us with whatever information we reasonably feel we need to decide whether to continue this Line of Credit. We agree to make requests for this information without undue frequency, and to give you reasonable time in which to supply the information.

You authorize us to make or have made any credit inquiries we feel are necessary. You also authorize the person or agencies to whom we make these inquiries to supply us with the information we request.

As required by California law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay

Page 8 of 9

1064
03/06

41   EX 3 pg 11 of 32

## ADDITIONAL TERMS

### YOUR BILLING RIGHTS -- KEEP THIS NOTICE FOR FUTURE USE
This notice contains important information about your rights and our
responsibilities under the Fair Credit Billing Act.

*Notify Us In Case of Errors or Questions About Your Bill*

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings, checking, share draft or other account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities*
*After We Receive Your Written Notice*

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases*

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or the services.  There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
(b) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE NOTICE SPECIFYING THE CIRCUMSTANCES AND TIME UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

Utah: THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS.

Missouri: ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE. TO PROTECT YOU (BORROWER) AND US (LENDER) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

Iowa: IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT. YOU ARE ENTITLED TO A COPY OF THIS AGREEMENT. YOU MAY REPAY THE UNPAID BALANCE AT ANY TIME WITHOUT PENALTY, AND IF THIS IS A CONSUMER CREDIT TRANSACTION YOU MAY BE ENTITLED TO RECEIVE A REFUND OF UNEARNED CHARGES IN ACCORDANCE WITH LAW.

Washington: PLEASE BE ADVISED THAT ORAL AGREEMENTS OR ORAL COMMUNICATIONS TO LOAN MONEY, EXTEND CREDIT, OR FOREBEAR FROM ENFORCING REPAYMENT OF THE DEBT ARE UNENFORCEABLE UNDER WASHINGTON LAW.

NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

YOU SHOULD CHECK WITH YOUR LEGAL ADVISOR AND WITH OTHER MORTGAGE LIEN HOLDERS AS TO WHETHER ANY PRIOR LIENS CONTAIN ACCELERATION CLAUSES WHICH WOULD BE ACTIVATED BY A JUNIOR ENCUMBRANCE.

20.   SIGNATURES: By signing below, you agree to the terms of this Agreement and you promise to pay any amounts you owe under this Agreement. You also state that you received a completed copy of this Agreement on today's date.

CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

_____ (Seal)        _____ 9-28-2007 (Seal)
ROBERT ALGOT WINBERG        -Borrower     SUSAN M WINBERG              -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                -Borrower

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay

1064
03/06

EX 3 pg 13 of 32

43

## FEE SCHEDULE

You agree to pay the following additional charges in connection with your Line of Credit:

1. **ADDITIONAL FINANCE CHARGES:** You agree to pay the following additional FINANCE CHARGES:

| | |
|---|---|
| Application Fee | $ 0.00 |
| Broker Fee | $ 0.00 |
| Closing Agent Fee | $ 0.00 |
| Flood Certification Fee | $ 0.00 |
| Lender Fees | $ 0.00 |
| Origination Fee | $ 0.00 |
| Points | $ 0.00 |
| Processing Fee | $ 0.00 |
| Tax Service Fee | $ 0.00 |
| (Other) _____ | $ 0.00 |

2. **OTHER CHARGES:** You agree to pay the following additional charges:

- Appraisal Fee | $ 0.00
- Check Re-order Fee | $ 5.00
- Credit Report Fee | $ 0.00
- Documentation Fee | $ 0.00
- Recording/Filing Fee | $ 0.00
- Title Insurance Fee | $ 0.00
- Title Search Fee | $ 0.00
- (Misc.) _____ | $ 0.00
- An annual charge of $75.00.
- A termination fee of $500.00 if terminated within the first three years (not applicable in NC, NJ, NY or SC, lesser of 2% of the line amount or $500 for NM). The fee will not be charged if the account remained unused (meaning that no funds were ever drawn against the credit line other than for closing costs at the time of origination and/or for other fees outlined on the Fee Schedule included herein) for the entire period from loan closing to the date of payoff.
- A late charge on any payment not paid within 15 days of the payment date of 5% of the payment.
- A charge of $10.00 for any advance made by special check in an amount less than the Minimum Advance (not applicable in New York).
- A charge of $10.00 per credit transaction that is in excess of your Credit Limit.
- A fee of $25.00 for each check, negotiable order of withdrawal or draft you issue in connection with this loan that is returned because it has been dishonored.
- A fee of $10.00 to stop payment.

Other charges will be assessed in accordance with the terms of the Line of Credit Agreement.

This Fee Schedule supplements the Line of Credit Agreement and is incorporated therein. Nothing contained in this Fee Schedule shall be deemed to impair in any way your obligations under the Line of Credit Agreement, the related security agreement, mortgage, or deed of trust, or any other document executed by you concerning the indebtedness evidenced by the Line of Credit Agreement.

| | |
|---|---|
| _(signature)_ (Seal) | _(signature)_ 9-18-2007 (Seal) |
| ROBERT ALGOT WINBERG     -Borrower | SUSAN M. WINBERG     -Borrower |
| _____ (Seal) | Pay To The Order Of _____ (Seal) |
| -Borrower | -Borrower |
| _____ (Seal) | Without Recourse _____ (Seal) |
| -Borrower | IndyMac Bank, F.S.B. -Borrower |
| | By: _(signature)_ |
| | Cathy Powers |
| | Vice President |

Indymac Bank
Multistate HELOC Agreement - I/O Min Pay

1064
03/06

44

EX 3 pg 14 of 32

## ALLONGE TO NOTE

Loan #:

For purposes of further endorsement of the following described Note, the allonge is affixed and becomes a permanent part of said Note.

Loan Amount:          $167,800.00

Note Date:            14-Sep-07

Borrower(s) Last Name:    WINBERG

Address:              1481 EAST COVINA HILLS ROAD
                      COVINA, CA 91724

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

PAY TO THE ORDER OF ONEWEST BANK, FSB, WITHOUT RECOURSE

FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for IndyMac
Federal Bank, FSB, successor to IndyMac Bank, F.S.B.

BY:        *Sandra Schneider*
NAME:      Sandra Schneider
TITLE:     Attorney-In-Fact

ALLONGE TO NOTE

Loan #: ████████████

For purposes of further endorsement of the following described Note, the allonge is
affixed and becomes a permanent part of said Note.

| | |
|---|---|
| Loan Amount: | $167,800.00 |
| Note Date: | 14-Sep-07 |
| Borrower(s) Last Name: | WINBERG |
| Address: | 1481 EAST COVINA HILLS ROAD COVINA, CA 91724 |

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

WITHOUT RECOURSE, PAY TO THE ORDER OF:

_____

BY:        _Sandra Schneider_

NAME:    Sandra Schneider

TITLE:    Vice President, OneWest Bank, FSB

46

EX 3 pg 16 of 32



**This page is part of your document - DO NOT DISCARD**



**20072207961**

**Pages: 016**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**09/25/07 AT 08:00AM**

| | |
|---|---|
| Fee: | 55.00 |
| Tax: | 0.00 |
| Other: | 0.00 |
| **Total: 55.00** | |

**Title Company**

**TITLE(S) :** _____



**L E A D     S H E E T**

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black ink.**

**Number of AIN's Shown**

▲       E366217       **THIS FORM IS NOT TO BE DUPLICATED**       ▲

EX 3 pg 17 of 32

RECORDING REQUESTED BY

WHEN RECORDED MAIL TO

| | |
|---|---|
| NAME | **IndyMac Bank, F.S.B. c/o Document Management** |
| MAILING ADDRESS | **901 E  104th Street Building B Suite 400/500** |
| CITY, STATE ZIP CODE | **Kansas City, MO 64131** |

**SPACE ABOVE THIS LINE IS RESERVED FOR RECORDER'S USE**

## TITLE (S)

# DEED OF TRUST

Recording Requested By:
INDYMAC BANK, F.S.B., C/O DOCUMENT MANAGEMENT

*[Company Name]*

And When Recorded Mail To:
INDYMAC BANK, F.S.B., C/O DOCUMENT MANAGEMENT
*[Company Name]*


*[Name of Natural Person]*
BLDG B, 901 E 104TH ST, SUITE 400/500
*[Street Address]*
KANSAS CITY, MO 64131
*[City, State Zip Code]*

——————————————— *[Space Above This Line For Recording Data]* ———————————————

# HOME EQUITY LINE OF CREDIT DEED OF TRUST
## Secondary Lien
### (Securing Future Advances)

Borrower has established a line of credit ("Home Equity Line of Credit") with Lender as evidenced by Borrower's Home Equity Line of Credit Agreement and Promissory Note dated the same date as this Security Instrument, and all renewals, extensions, modifications, replacements and substitutions thereof (collectively, the "Agreement"). Lender has agreed to make advances to Borrower under the terms of the Agreement. Such advances shall be of a revolving nature and may be made, repaid and remade from time to time. Borrower and Lender contemplate a series of advances to be secured by this Security Instrument. The total outstanding principal balance owing at any one time under the Agreement (not including charges and collection costs which may be owing from time to time) shall not exceed   one hundred sixty seven thousand eight hundred and NO/100ths                (U.S. $ 167,800.00        ) plus interest thereon (the "Credit Limit"). That sum is referred to in the Agreement as the Credit Limit. The entire indebtedness under the Agreement, if not paid earlier, is due and payable on   October 15, 2027   or on such later date as may be permitted by Lender in writing, or at such earlier date in the event such indebtedness is accelerated in accordance with the terms of the Agreement and/or this Security Instrument.

## DEFINITIONS

Words used in multiple sections of this Security Instrument are defined below and other words are defined in Sections 3, 10, 12, 17, 19, and 20. Certain rules regarding the usage of words used in this Security Instrument are also provided in Section 15.

(A)     "Security Instrument" means this Home Equity Line of Credit Deed of Trust, which is dated September 14, 2007        , together with all Riders to this document.

(B)     "Borrower" is ROBERT ALGOT WINBERG AND SUSAN M. WINBERG, HUSBAND AND WIFE AS JOINT TENANTS

                                        . Borrower is the trustor under this Security Instrument.

70035CA 08/02
002, The Compliance Source, Inc.

(C)     "**Lender**" is  INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK

Lender is a                         Federal Savings Bank                  organized and existing under the laws of
United States of America Lender's address is   155 NORTH LAKE AVENUE, PASADENA, CA 91101

Lender is the beneficiary under this Security Instrument.

(D)     "**Trustee**" is  FIRST AMERICAN TITLE INSURANCE CO.

(E)     "**Agreement**" means the Home Equity Line of Credit Agreement and Promissory Note signed by Borrower and
dated          September 14, 2007          . The Agreement states Lender has agreed to make advances to Borrower
under the terms of the Agreement, such advances to be of a revolving nature. The total outstanding principal balance owing at
any one time under the Agreement (not including charges and collection costs which may be owing from time to time under the
Agreement) not to exceed the Credit Limit of  one hundred sixty seven thousand eight hundred and
NO/100ths                                       Dollars (U.S. $   167,800.00       )
plus interest. Borrower has promised to pay the total outstanding balance in Periodic Payments and to pay the entire debt in
full not later than          October 15, 2027          .

(F)     "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G)     "**Account**" means the debt evidenced by the Agreement, plus interest, any other charges due under the Agreement,
and all sums due under this Security Instrument, plus interest.

(H)     "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to
be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Home Improvement Rider | ☐ Revocable Trust Rider | |
| ☐ Other(s) *[specify]* | | |

(I)     "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)     "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that
are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)     "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or
similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape
so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited
to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and
automated clearinghouse transfers.

(L)     "**Escrow Items**" means those items that are described in Section 3.

(M)     "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third
party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of,
the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

Deed of Trust – Secondary Lien
Page 2 of 13

www.compliancesource.com                                                            70035CA 02/07
                                                                       2. The Compliance Source, Inc.

**(N)**    **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Agreement and the Account.

**(O)**    **"Periodic Payment"** means the amount due from Borrower to Lender each month for (i) principal and/or interest under the Agreement, and all late charges and other charges provided herein or authorized by the Agreement, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)**    **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to the escrow account requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Agreement and the Account do not qualify as a "federally related mortgage loan" under RESPA.

**(Q)**    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Agreement and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (a) the prompt repayment of the Account evidenced by the Agreement, and all renewals, extensions and modifications of the Agreement, with interest thereon at the rate provided in the Agreement; the payment of all other sums due under the Agreement, with interest thereon at the rate provided in the Agreement, (i) advanced to protect the security of this Security Instrument, (ii) incurred by Lender in connection with the enforcement of its rights under this Security Instrument and/or the Agreement, and/or (iii) required to be paid as set forth herein or in the Agreement; and (c) the performance of Borrower's covenants and agreements under this Security Instrument, the Agreement and any prior mortgage or deed of trust.

For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described real property located in the          County          of          LOS ANGELES          :
                              *[Type of Recording Jurisdiction]*                    *[Name of Recording Jurisdiction]*
SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

Assessor's Identification Number:

which currently has the address of          1481 EAST COVINA HILLS ROAD
                                                          *[Street]*
          COVINA          , California          91724          ("Property Address").
          *[City]*                              *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

www.compliancesource.com    70035CA 08/02
©2002, The ComplianceSource, Inc.

EX 3 pg 21 of 32

51



THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

**1.   Payment of Principal, Interest and Other Charges.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Agreement and if allowable under Applicable Law, any prepayment charges, late charges and other charges due under the Agreement.  Payments due under the Agreement and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Agreement or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Agreement and this Security Instrument be made in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

**2.   Application of Payments or Proceeds.**  Payments are deemed received by Lender when received at the location designated in the Agreement or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14 or in such manner or location as required under Applicable Law.  Except as otherwise described in this Section 2, and as permitted under Applicable Law, all payments accepted and applied by Lender shall be applied to the outstanding Account in the following order of priority:  (i) any prepayment charges due under the Agreement and/or this Security Instrument if permitted by Applicable Law; (ii) amounts due under this Security Instrument to secure the amounts advanced under the Account and to protect Lender's security; (iii) any escrow payments under Section 3 of this Security Instrument, if Lender requires such payments; (iv) any late charges; (v) any other fees and charges other than finance charges; (vi) accrued and unpaid finance charges due under the Agreement; and (vii) any unpaid principal balance due under the Agreement.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  To the extent permitted by Applicable Law, voluntary prepayments shall be applied first to any prepayment charges and then as described in the Agreement.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Agreement shall not extend or postpone the due date, or change the amount of the Periodic Payments.

**3.   Funds for Escrow Items.**  Subject to Applicable Law, Borrower shall pay to Lender on the days Periodic Payments are due under the Agreement, until the Account is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums.  These items are called "Escrow Items."  At origination or at any time during the term of the Agreement, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section 3.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender the Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 8.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 8 and pay such amount and Borrower shall then be obligated under Section 8 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender

Deed of Trust – Secondary Lien
Page 4 of 13

70035CA 08/02
©2002, The Compliance Source, Inc.

—THE COMPLIANCE SOURCE—
www.compliancesource.com

EX 3 pg 22 of 32

52



shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA to mean the amount by which a current escrow balance falls short of the target balance at the time of escrow analysis, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA to mean the amount of the negative balance in the escrow account, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender. If under Section 21 the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

4.    **Charges; Liens.**  Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument. Borrower shall pay when due, all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien other than a lien disclosed to Lender in Borrower's application or in any title report Lender obtained which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Agreement, the Account and this Security Instrument, if allowed under Applicable Law.

5.    **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Agreement. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with the Agreement, the Account and this Security Instrument, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the

Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5, shall be added to the unpaid balance of the Account and interest shall accrue at the rate set forth in the Agreement, from the time it was added to the unpaid balance until it is paid in full.

Subject to Applicable Law, all insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Agreement, up to the amount of the outstanding Account balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage not otherwise required by Lender, for damage to, or destruction of the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Agreement and the Account, up to the amount of the outstanding Account balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, and subject to the rights of any holder of a mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds, and shall be the sole obligation of Borrower. Subject to the rights of any holder of a mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument, if the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Lender believes that Borrower has abandoned the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Agreement, the Account or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Subject to the rights of any holder of a mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument, Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Agreement, the Account or this Security Instrument, whether or not then due.

6. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. If the Property is damaged, unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

THE COMPLIANCE SOURCE, INC.
www.compliancesource.com
...st – Secondary Lien
Page 6 of 13
7003SCA 08/02
...2, The Compliance Source, Inc.

54

EX 3 pg 24 of 32

**7.   Borrower's Home Equity Line of Credit Application.** Borrower shall be in default if, during the home equity line of credit application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Agreement, the Account and this Security Instrument. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**8.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which has or may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Lender believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has or may attain priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument if allowed under Applicable Law. These amounts shall bear interest at the rate set forth in the Agreement from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**9.   Mortgage Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Agreement and the Account) for certain losses it may incur if Borrower does not repay the Account as agreed. Borrower is not a party to the Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of entering into the Agreement and establishing the Account, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.

**10.   Assignment of Miscellaneous Proceeds; Forfeiture.** The Miscellaneous Proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or any part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument.

If the Property is damaged and if the restoration or repair is economically feasible and Lender's security is not lessened, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

If Lender believes that the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, then Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights

—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Trust – Secondary Lien
Page 7 of 13

7003SCA 08/02
©2002, The Compliance Source, Inc.

SS

EX 3  pg 25 of 32

under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization, if applicable, of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization, if applicable, of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** When Borrower (as that term is defined above) includes more than one person, Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Agreement (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Agreement without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Account Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, as allowed under Applicable Law, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender shall have the authority to impose additional fees and charges to perform services requested by or on behalf of Borrower, or to otherwise administer and service the Agreement and the Account. The additional fees and charges may include administrative costs incurred by Lender and/or in reimbursement of payments made by Lender to third parties. Such fees and charges may include, without limitation, any and all costs or fees associated with the origination and/or servicing of such Agreement and the Account, document copy or preparation fees, transmittal, facsimile or delivery fees, reconveyance and release fees, property inspections and returned check or insufficient funds charged in connection with payments made by or on behalf of Borrower under the Agreement and all other such fees for ancillary services performed by Lender for Borrower or at Borrower's request or for services necessitated by or resulting from Borrower's default or malfeasance relating to this Security Instrument or the Agreement or incurred by Lender or assessed upon Borrower pursuant to the provisions of this Security Instrument or the Agreement. Such fees and charges shall be secured by this Security Instrument up to the amount of the Credit Limit and, unless Borrower and Lender agree to other terms of payment, shall bear interest from the date assessed by Lender at the rate stated in the Agreement, and in effect from time to time, and shall be payable, with interest, immediately following written demand from Lender to Borrower requesting payment thereof. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law. The absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.

If either the Agreement or the Account is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected or to be collected in connection with the Agreement and the Account exceed the permitted limits, then: (a) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to Borrower, which Lender may accomplish by reducing the principal owed under the Agreement or by

EX 3 pg 24 of 32

making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Agreement). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower may have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Agreement conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Agreement which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Agreement and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Agreement as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, as allowed under Applicable Law; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured

—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Deed of Trust – Secondary Lien
Page 9 of 13

7803SCA 08/01
2002, The Compliance Source, Inc.

EX 3 pg 27 of 32

hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

19. **Sale of the Agreement and the Account; Change of Loan Servicer; Notice of Grievance.** The Agreement and the Account, or a partial interest in the Agreement and the Account (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Agreement and this Security Instrument and performs other mortgage loan servicing obligations under the Agreement, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Agreement and the Account. If there is a change of the Loan Servicer, if required under Applicable Law, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Agreement and the Account are sold and thereafter the Agreement and the Account are serviced by a Loan Servicer other than the purchaser of the Agreement and the Account, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the purchaser of the Agreement and the Account unless otherwise provided by the purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 19. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

20. **Hazardous Substances.** As used in this Section 20: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including, but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Events of Default; Acceleration; Remedies.** The occurrence of any one or more of the following events shall, at the election of Lender, constitute an "Event of Default," and shall entitle Lender to terminate the Agreement and the Account and accelerate the indebtedness secured hereby: (a) any Borrower engages in fraud or material misrepresentation, whether by action or omission, in connection with any phase of the Agreement; (b) Borrower fails to meet the repayment terms set forth in the Agreement; or (c) Borrower's action or inaction adversely affects the Property or Lender's security interest, including, but not limited to, Borrower's actions or omissions that constitute "Events of

EX 3 pg 28 of 32

58

Default" under the Agreement, or Borrower's failure to perform any material covenants or agreements contained in this Security Instrument.

Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. Reconveyance. Upon request from Borrower and upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes and agreements evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

23. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

24. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

25. Obligation to Advance. Lender's obligation to advance funds to Borrower upon and subject to the terms stated in the Agreement after receipt of a Credit Line Check or other request for an advance made in accordance with the Agreement shall be obligatory.

26. **Request for Notice of Default and Sale.** In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any notice of default and a copy of any notice of sale under the deed of trust (or mortgage) recorded _____, in Book _____ page _____ records of LOS ANGELES County, (or filed for record with recorder's serial number _____, LOS ANGELES County) California, executed by _____ as trustor (or mortgagor) in which _____, is named as beneficiary (or mortgagee) and _____ as trustee be mailed to Name **INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK** at Address **155 NORTH LAKE AVENUE, PASADENA, CA 91101**.

**Notice:** A copy of any notice of default and of any notice of sale will be sent only to the address contained in this recorded request. If your address changes, a new request must be recorded.

Signature _____

### REQUEST FOR NOTICE OF DEFAULT
### AND FORECLOSURE UNDER SUPERIOR
### MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give notice to Lender, at Lender's address set forth on page two of this Security Instrument, of any default under the superior encumbrance and of any sale or other foreclosure action.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____    (Seal)
Printed Name _____    ROBERT ALGOT WINBERG    -Borrower
                                                          Printed Name
_____
        *(Please Complete)*

_____

_____    (Seal)
Printed Name _____    SUSAN M. WINBERG    -Borrower
                                                      Printed Name
_____
        *(Please Complete)*

_____    (Seal)
                                     -Borrower
                                     Printed Name

_____    (Seal)
                                     -Borrower
                                     Printed Name

60

EX 3 pg 30 of 32

State of _California_                                    §
County of _Los Angeles_                                 §
                                                        §

On _09·18·2007_ before me, _Catherine Cooper Notary Public_, personally appeared
ROBERT ALCOT WINBERG and SUSAN M. WINBERG
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

Witness my hand and official seal.

(Seal)



Notary Public _Catherine Cooper_                  [Printed Name]

My Commission Expires: _02·17·2008_

CATHERINE COOPER
Comm
NOTARY PUBLIC - CALIFORNIA
Los Angeles County
My Comm. Expires FEB. 17, 2008

...ed of Trust – Secondary Lien
Page 13 of 13

THE COMPLIANCE SOURCE, INC.
www.compliancesource.com

70035CA 08/02
©2002, The Compliance Source, Inc.

EX 3 pg 31 of 32

Exhibit

SCHEDULE "A"

THE FOLLOWING DESCRIBED REAL PROPERTY LOCATED IN THE CITY OF
COVINA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS
FOLLOWS: THAT PORTION OF LOT 3 OF THE CHAFFEY TRACT, AS PER MAP
RECORDED IN BOOK 59, PAGE 14 OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF COVINA HILLS ROAD
(FORMERLY POMONA AND COVINA ROAD) AS SHOWN ON SAID MAP WHICH IS
NORTH 67 DEGREES 36 MINUTES 35 SECONDS WEST 265.41 FEET AND SOUTH
FEET FROM THE
SOUTHEASTERLY CORNER OF SAID LOT 3; THENCE ALONG THE WESTERLY
LINE OF THE LAND CONVEYED TO JAMES D. RYAN, ET UX, BY DEED
RECORDED ON JULY 12, 1960, AS INSTRUMENT NO. 2174 IN BOOK D-907,
PAGE 449, OFFICIAL RECORDS OF SAID COUNTY, NORTH 6 DEGREES 43
MINUTES 15 SECONDS WEST 309.95 FEET TO THE NORTHWESTERLY CORNER
OF SAID LAND; THENCE SOUTH 83 DEGREES 16 MINUTES 14 SECONDS WEST
61.40 FEET; THENCE SOUTH 38 DEGREES 16 MINUTES 45 SECONDS WEST
68.73 FEET; THENCE SOUTH 6 DEGREES 43 MINUTES 15 SECONDS EAST
261.40 FEET TO SAID NORTHERLY LINE OF COVINA HILLS ROAD; THENCE
ALONG SAID NORTHERLY LINE, NORTH 83 DEGREES 16 MINUTES 45 DEGREES
EAST TO THE POINT OF BEGINNING.

FOR INFORMATIONAL PURPOSES ONLY: APN:

EX 3 pg 32 of 32

# EXHIBIT "4"

**This page is part of your document - DO NOT DISCARD**



**20071789376**  **Pages: 020**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**07/30/07 AT 08:00AM**

Fee: 67.00
Tax: 0.00
Other: 0.00
Total: 67.00

Title Company

## TITLE(S) :



L E A D    S H E E T

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black ink.**        **Number of AIN's Shown**

## THIS FORM IS NOT TO BE DUPLICATED

LOS ANGELES, CA  Document:TD 2007.1789376                                Page:1 of 20

Printed on:1/29/2014 12:03 PM

64        EX 4 pg 1 of 20

2

Recording Requested By:

**WELLS FARGO BANK, N.A.**
**1150 W. WASHINGTON**
**TEMPE, AZ  85281-**

Chicago Title *1406750*
ServiceLink Division
4000 Industrial Blvd
Aliquippa, PA 15001

Prepared By:
**GLEN BARLICS**
**WELLS FARGO BANK, N.A.**
**1150 W. WASHINGTON**
**TEMPE, AZ  85281-**



07/30/07

**20071789376**

19

——————————————— [Space Above This Line For Recording Data] ———————————————

# DEED OF TRUST

0170777056

## DEFINITIONS

*Tax/Parcel  8447-005-030*

Words used in multiple sections of this document are defined below and other words are
defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used
in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **JULY 13, 2007**
together with all Riders to this document.
**(B) "Borrower"** is
**ROBERT ALGOT WINBERG AND SUSAN M. WINBERG, HUSBAND AND WIFE AS**
**JOINT TENANTS**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is  **WELLS FARGO BANK, N.A.**

Lender is a  **National Association**
organized and existing under the laws of  **THE UNITED STATES OF AMERICA**

**CALIFORNIA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Page 1 of 18       Initials:

**FORM 3005    1/01**

SCA01    Rev 11/09/00

65

EX 4 pg 2 of 20

3

Lender's address is
**P. O. BOX 5137, DES MOINES, IA 50306-5137**
Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is **FIDELITY NATIONAL TITLE INSURANCE COMPANY**
**(E) "Note "** means the promissory note signed by Borrower and dated **JULY 13, 2007**
The Note states that Borrower owes Lender **FIVE HUNDRED EIGHTY-FIVE THOUSAND
AND NO/100**                                                    Dollars
(U.S. $ ......585,000.00...........) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than   **AUGUST 1, 2037**
**(F) "Property"** means the property that is described below under the heading "Transfer of
Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges
and late charges due under the Note, and all sums due under this Security Instrument, plus
interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower.
The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider                 ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider    ☐ 1-4 Family Rider
☐ VA Rider                   ☐ Biweekly Payment Rider           ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an
electronic terminal, telephonic instrument, computer, or magnetic tape so as to order,
instruct, or authorize a financial institution to debit or credit an account. Such term includes,
but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers
initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation
or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et
seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be
amended from time to time, or any additional or successor legislation or regulation that

SCA02   Rev  12/16/00          Page 2 of 18       Initials:_____       FORM 3005   1/01

07 1789376

LOS ANGELES, CA  Document:TD 2007.1789376                              Page:3 of 20

Printed on:1/29/2014 12:03 PM

66

Ex 4 pg 3 of 20

Branch :OC3, User:1023    Case 2:14-bk-12076-WB    Doc 14    Filed 02/27/14    Entered 02/27/14 11:33:58    Desc
Main Document    Page 67 of 117

4

governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA. **(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's convenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | LOS ANGELES |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

**LEGAL DESCRIPTION IS ATTACHED HERETO AS SCHEDULE "A" AND MADE A PART HEREOF.**

EXHIBIT "A"

Parcel ID Number:                                        which currently has the address of
**1481 EAST COVINA HILLS ROAD**                                        [Street]
**COVINA**                                [City]  , California        **91724**        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

| SCA03   Rev 11/09/00 | Page 3 of 18 | Initials | FORM 3005   1/01 |

Branch :OC1 User :1023  Case 2:14-bk-12076-WB    Doc 14    Filed 02/27/14    Entered 02/27/14 11:33:58    Desc
Main Document    Page 68 of 117

5

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

07 1789376

SCA04    Rev 11/09/00          Page 4 of 18          Initials:          FORM 3005    1/01

6

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be

SCA05    Rev 11/09/00            Page 5 of 18        Initials:            FORM 3005    1/01

69

Ex 4 pg 6 of 20

required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination

SCA06    Rev 09/22/00              Page 6 of 18         Initials:_____              FORM 3005    1/01

LOS ANGELES, CA  Document:TD 2007.1789376                                      Page:7 of 20

Printed on:1/29/2014 12:03 PM

EX 4 pg 7 of 20

70

*8*

or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In

SCA07    Rev  11/09/00                    Page 7 of 18            Initials:_____            FORM 3005    1/01

EX 4 pg 8 of 20

71

9

either event, or if Lender acquires the Property under Section 22 or otherwise. Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or

07 1789376

SCA08   Rev 09/22/00          Page 8 of 18          Initials          FORM 3005   1/01



72

*10*

(c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

| SCA09   Rev  11/13/00 | Page 9 of 19 | Initials: | FORM 3005   1/01 |

07 1789376

EX 4 pg 10 of 20

73

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exhange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

SCA10   Rev 09/22/00                     Page 10 of 18        Initials:              FORM 3005   1/01

74         EX 4 pg 11 of 20

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by

SCA11    Rev 11/09/00                     Page 11 of 18          Initials:                   FORM 3009    1/01

*13*

this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly

07 1789376

SCA12   Rev 11/09/00          Page 12 of 16          Initials:          FORM 3005   1/01

*14*

requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

07 1789376

SCA13   Rev 11/09/00          Page 13 of 18          Initials:          FORM 3005    1/01

77

EX 4 pg 14 of 20

*15*

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.

| | | | | |
|---|---|---|---|---|
| SCA14   Rev 12/27/00 | Page 14 of 18 | Initials: | | FORM 3005   1/01 |

78            EX 4 pg 15 of 20

Branch :OG3 User :PR23 Comment: Case 2:14-bk-12076-WB    Doc 14    Filed 02/27/14    Entered 02/27/14 11:33:58    Desc
Main Document    Page 79 of 117

16

The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or

07 1789376

SCA15    Rev 10/13/00                    Page 15 of 19              Initials:              FORM 3005    1/01

79

EX 4 pg 16 of 20

*17*

before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

07 1789376

SCA16    Rev 09/22/00                    Page 16 of 16        Initials:                    FORM 3005    1/01

---


EX 4 pg 17 of 20

*18*

**BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.**

Witnesses:

_____          ROBERT A WINBERG                    (Seal)
                                                                                Borrower

_____          SUSAN M WINBERG                     (Seal)
                                                                                Borrower

07 1789376

SCA17    Rev  12/27/00          Page 17 of 18          Initials:          FORM 3005    1/01

81          EX 4 pg 18 of 20

*19*

State of California,                                                                ss:

County of *Los Angeles*

On *July 13, 2007*   before me, *Monika Leiterman, Notary Public*

**ROBERT ALGOT WINBERG AND SUSAN M. WINBERG, HUSBAND AND WIFE AS**   personally appeared
**JOINT TENANTS**

~~, personally known to me~~
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
~~is/~~are subscribed to the within instrument and acknowledged to me that ~~he/she/~~they
executed the same in ~~his/her/~~their authorized capacity(ies), and that by ~~his/her/~~their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

**WITNESS my hand and official seal.**

*Monika Leiterman* _____ (Seal)

MONIKA LEITERMAN
Commission # 1703938
Notary Public - California
Los Angeles County
My Comm. Expires Dec 7, 2010

07 1789376

SCA16   Rev 10/17/00                    Page 18 of 18          Initials:              FORM 3005   1/01

20

### Exhibit "A"
### Legal Description

All that certain parcel of land situate in the City of Covina, County of Los Angeles and State of California being known and designated as follows:

THAT PORTION OF LOT 3 OF THE CHAFFEY TRACT, IN THE CITY OF COVINA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 59 PAGE 14 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF COVINA HILLS ROAD (FORMERLY POMONA AND COVINA ROAD) AS SHOWN ON SAID MAP WHICH IS NORTH 67° 36' 35" WEST 265.41 FEET AND SOUTH 83° 16' 45" WEST 947.46 FEET FROM THE SOUTHEASTERLY CORNER OF SAID LOT 3; THENCE ALONG THE WESTERLY LINE OF THE LAND CONVEYED TO JAMES D. RYAN, ET UX, BY DEED RECORDED ON July 12, 1960 AS INSTRUMENT NO. 2174 IN BOOK D907 PAGE 449 OF OFFICIAL RECORDS OF SAID COUNTY, NORTH 6° 43' 15" WEST 309.95 FEET TO THE NORTHWESTERLY CORNER OF SAID LAND; THENCE SOUTH 83° 16' 14" WEST 61.40 FEET; THENCE SOUTH 38° 16' 45" WEST 68.73 FEET; THENCE SOUTH 6° 43' 15" EAST 261.40 FEET TO SAID NORTHERLY LINE OF COVINA HILLS ROAD; THENCE ALONG SAID NORTHERLY LINE, NORTH 83° 16' 45" EAST TO THE POINT OF BEGINNING.

Tax/Parcel ID: 8447-005-030

1406750

07 1789376

EX 4 pg 20 of 20

83

# EXHIBIT "5"

Harris Appraisals

File No. C140010

APPRAISAL OF



Real Property

LOCATED AT:

1481 E. Covina Hills Rd.
Covina, CA 91724

CLIENT:

homeowner

AS OF:

January 24, 2014

BY:

Chad Harris

EX 5 pg 1 of 30

**Harris Appraisals**

File No. C140010

homeowner

File Number:  C140010

In accordance with your request, I have appraised the real property at:

1481 E. Covina Hills Rd.
Covina, CA  91724

The purpose of this appraisal is to develop an opinion of the defined value of the subject property, as improved.
The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the defined value of the property as of   January 24, 2014                    is:

$602,000
Six Hundred Two Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions,
final opinion of value, descriptive photographs, assignment conditions and appropriate certifications.

Chad Harris

EX 5 pg 2 of 30

Harris Appraisals
Residential Appraisal Report    File No. C140010

The purpose of this appraisal report is to provide the client with a credible opinion of the defined value of the subject property, given the intended use of the appraisal.

**PURPOSE**

| | | |
|---|---|---|
| Client Name/Intended User homeowner | E-mail | |
| Client Address | City | State | Zip |
| Additional Intended User(s) | | |

Intended Use bankruptcy

**SUBJECT**

| | | | | |
|---|---|---|---|---|
| Property Address 1481 E. Covina Hills Rd. | City Covina | State CA | Zip 91724 |
| Owner of Public Record Winberg Robert A, Winberg Susan M | | County Los Angeles | |
| Legal Description See Attached Addendum. | | | |
| Assessor's Parcel # 8447-005-030 | Tax Year 2012 | R.E. Taxes $ 5,753.00 | |
| Neighborhood Name Covina Hills | Map Reference 599-F7 | Census Tract 4036.00 | |
| Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe) | | | |
| My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal | | | |
| Prior Sale/Transfer: Date No prior sales in the    Price Last 36 months.    Source(s) Public Records | | | |

Analysis of prior sale or transfer history of the subject property (and comparable sales, if applicable)    The subject property has not sold or transferred in the past 36
months. The subject property has not been listed in the past 12 months.

**SALES HISTORY**

Offerings, options and contracts as of the effective date of the appraisal    None

**NEIGHBORHOOD**

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | | | Property Values [X] Increasing [ ] Stable [ ] Declining | | | PRICE | AGE | One-Unit | 98% % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | | | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | | | $(000) | (yrs) | 2-4 Unit | % |
| Growth [ ] Rapid [X] Stable [ ] Slow | | | Marketing Time [X] Under 3 mths [ ] 3-6 mths [ ] Over 6 mths | | | 356 Low | 7 | Multi-Family | % |
| Neighborhood Boundaries Walnut Creek County Park north, City Limits east, 10 Freeway south, | | | | | | 2400 High | 68 | Commercial | % |
| Grand Avenue west. | | | | | | 747 Pred. | 53 | Other Vacant | 2% % |

Neighborhood Description    See Attached Addendum.

Market Conditions (including support for the above conclusions)    See Attached Addendum.

**SITE**

| | | | | | | |
|---|---|---|---|---|---|---|
| Dimensions See Plat Map | | Area 32,815 Sqft. | | Shape Irregular | | View Residential |
| Specific Zoning Classification CVE1YY | | Zoning Description Single Family Residence | | | | |
| Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe) | | | | | | |
| Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No    If No, describe. | | | | | | |

| Utilities | Public | Other (describe) | | Public | Other (describe) | | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | City Service | Water | [X] | City Service | | Street Asphalt | [X] | [ ] |
| Gas | [X] | City Service | Sanitary Sewer | [ ] | [X] Septic Tank | | Alley None | [ ] | [ ] |

Site Comments    The subject site is located on and fronts Covina Hills Rd. which is a busy rod that is a main traffic artery for the subject's
neighborhood. As a result of the subject's location the property is subject to ongoing traffic and noise. The external obsolescence
adversely impacts the marketability of the subject property.

**IMPROVEMENTS**

| GENERAL DESCRIPTION | | FOUNDATION | | EXTERIOR DESCRIPTION | materials | INTERIOR | materials |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One w/Acc. unit [ ] | | [ ] Concrete Slab [X] Crawl Space | | Foundation Walls | Peir&Beam/Avg. | Floors | Cpt./Lin. Wd./Avg. |
| # of Stories  One | | [ ] Full Basement [ ] Partial Basement | | Exterior Walls | Stucco/Avg. | Walls | Drywall/Avg. |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | | Basement Area 0.0000    sq.ft. | | Roof Surface | Comp./Gd. | Trim/Finish | Wd. Avg. |
| [X] Existing [ ] Proposed [ ] Under Const. | | Basement Finish N/A    % | | Gutters & Downspouts None | | Bath Floor | Tile/Avg. |
| Design (Style) Mdrn | | [ ] Outside Entry/Exit [ ] Sump Pump | | Window Type | Sliders/Jalousie/Avg | Bath Wainscot | Tile/Avg. |
| Year Built 1962 | | | | Storm Sash/Insulated None | | Car Storage | [ ] None |
| Effective Age (Yrs) 35 | | | | Screens | Yes/ Avg. | [X] Driveway | # of Cars  2 |
| Attic | [ ] None | Heating [X] FWA [ ] HW [ ] Radiant | | Amenities | WoodStove(s) # | Driveway Surface Asphalt | |
| [ ] Drop Stair | [ ] Stairs | [ ] Other    Fuel Gas | | [X] Fireplace(s) # 2 | [X] Fence | [X] Garage | # of Cars  2 |
| [ ] Floor | [X] Scuttle | Cooling [X] Central Air Conditioning | | [X] Patio/Deck | [X] Porch | [ ] Carport | # of Cars |
| [ ] Finished | [ ] Heated | [ ] Individual [ ] Other | | [X] Pool In-Grnd. | [ ] Other | [ ] Att. | [X] Det. [ ] Built-in |
| Appliances [ ] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [X] Microwave [ ] Washer/Dryer [ ] Other (describe) | | | | | | | |
| Finished area above grade contains    8 Rooms    4 Bedrooms    3 Bath(s)    2,499 Square Feet of Gross Living Area Above Grade | | | | | | | |

Additional Features  Subject has a front wood deck, covered patio, two fireplaces, and hardwood flooring.

Comments on the Improvements    The subject appears to be built with average quality materials and craftsmanship. The subject property is
currently in fair condition due to significant deferred maintenance. One of the subject's three full bathrooms has been updated. The
remaining bathrooms are in fair to poor condition. The master bathroom shower was not operational at the time of inspection. The
master bathroom floor is in poor condition and has a rotting subfloor. The hall bathroom vinyl flooring is also in poor condition and is in
need of replacement. The subject is also missing closet doors, and several interior doors are damaged and need to be replaced. The
master bathroom also has discoloration on the walls which may be signs of possible mold. The kitchen cabinets are missing shelving
and the cabinets under the kitchen sink has suffered water damage from a current leak. The subject is also in need of interior exterior
paint, and the hard wood flooring is in need of refinishing. The asphalt driveway needs to be sealed and slurry coated.

Produced using ACI software, 800.234.8727 www.aciweb.com
Page 1 of 4
This form Copyright © 2005-2010 ACI Division of ISO Claims Services, Inc., All Rights Reserved.
(gPAR™) General Purpose Appraisal Report 12/2005
GPAR0206 05/09 1A/0/0

gpar™

EX 5 pg 3 of 30

Harris Appraisals
Residential Appraisal Report

File No. C140010

| FEATURE | SUBJECT | COMPARABLE SALE NO 1 | | COMPARABLE SALE NO 2 | | COMPARABLE SALE NO 3 | |
|---|---|---|---|---|---|---|---|
| | 1481 E. Covina Hills Rd. | 20510 E. Rancho San Jose Dr. | | 19601 E. Covina Hills Rd. | | 20422 E. Covina Hills Rd. | |
| Address  Covina | | Covina | | Covina | | Covina | |
| Proximity to Subject | | 0.26 miles E | | 0.68 miles WNW | | 0.18 miles ESE | |
| Sale Price | $        N/A | | $      610,000 | | $      499,950 | | $      680,000 |
| Sale Price/Gross Liv. Area | $  0.00 sq ft. | $  250.10 sq. ft. | | $  247.38 sq. ft. | | $  230.27 sq. ft. | |
| Data Source(s) | Site Inspection | MRMLS# SR13090719; DOM:33 | | MRMLS# CV13130312; DOM: 42 | | MRMLS#CV12151001; DOM: 119 | |
| Verification Source(s) | County Recs | Doc#700426/ Real Quest MLS.Broker | | Doc# 1200048/ Real Quest,MLS.Broker | | Doc# 733942/ Real Quest, MLS.Broker | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | N/A | Cash | | Conventional | | Conventional | |
| Concessions | N/A | REO | 12,000 | STD Sale | | Shrt Sale | 14,000 |
| Date of Sale/Time | N/A | 05/28/2013 | | 08/16/2013 | | 05/16/2013 | |
| Location | Subrb./Traffic | Suburban | -12,000 | Subrb./Traffic | | Subrb./Traffic | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 32,815 Sqft. | 30,402 Sq.Ft. | 5,000 | 24,176 Sq.Ft. | 16,000 | 44,867 Sq.Ft. | -67,000 |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Traditional | Traditional | | Traditional | | Traditional | |
| Quality of Construction | Frame | Frame | | Frame | | Frame | |
| Actual Age | 52+/- Years | 59 Years | | 57 Years | | 68 Years | |
| Condition | Fair | Similar | | Average | -20,000 | Average | -20,000 |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 8   4      3 | 8   4      3 | | 7   3      2 | 10,000 | 8   4      3 | |
| Gross Living Area  80 | 2,499 sq ft. | 2,439 sq ft. | | 2,021 sq ft. | 38,200 | 2,953 sq ft. | -36,300 |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Gas FAU C/Air | Gas FAU C/Air | | Gas FAU C/Air | | Gas FAU C/Air | |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 2 Car Garage | 4 Car Garage | -10,000 | 2 Carport | 10,000 | 3 Car Garage | -5,000 |
| Porch/Patio/Deck | Patio,Porch | Enclsd.Pto.,Prch | -3,000 | Patio,Porch | | Patio,Porch | |
| Fireplaces | 2 F/P | 2 F/P | | 1 F/P | 1,000 | 2 F/P | |
| Pool | Pool/Spa | Pool | | No Pool | 15,000 | Barn/ Bonus Rm. | |
| Net Adjustment (Total) | | [ ] + [X] - $ | 8,000 | [X] + [ ] - $ | 70,200 | [ ] + [X] - $ | 114,300 |
| Adjusted Sale Price | | Net Adj.   -1.3% | | Net Adj.   14.09% | | Net Adj.  -16.8% | |
| of Comparables | | Gross Adj.   6.9% $ | 602,000 | Gross Adj. 22.0% $ | 570,150 | Gross Adj 20.9% $ | 565,700 |

Summary of Sales Comparison Approach    See Attached Addendum.

COST APPROACH TO VALUE

Site Value Comments

| | ESTIMATED  [ ] REPRODUCTION OR  [ ] REPLACEMENT COST NEW | OPINION OF SITE VALUE ........................... = $ | |
|---|---|---|---|
| Source of cost data | | Dwelling          Sq. Ft. @ $ .......... = $ | 0 |
| Quality rating from cost service | Effective date of cost data | Sq. Ft @ $ .......... = $ | 0 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | |

The Cost Approach has not been performed in this assignment-
this does not affect the ability to obtain credible results as buyers
and sellers as well as the appraiser's peers do not rely upon this
approach for single-family residential property that is at it's
Highest & Best Use. The Income Approach was not utilized nor
considered relevant as the subject is an owner occupied single-
family residence in a neighborhood of similar type single-family
residences not intended for income production.

| Garage/Carport        Sq. Ft @ $ ........... = $ | 0 |
|---|---|
| Total Estimate of Cost-New         ............... = $ | 0 |
| Less   0   Physical   Functional   External | |
| Depreciation                                    = $( | 0) |
| Depreciated Cost of Improvements ................. = $ | 0 |
| "As-is" Value of Site Improvements ............... = $ | |
| INDICATED VALUE BY COST APPROACH ................. = $ | 0 |

INCOME APPROACH TO VALUE

Estimated Monthly Market Rent $          N/A   X Gross Rent Multiplier       N/A   = $       N/A  Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

Indicated Value by: Sales Comparison Approach $ 602,000          Cost Approach (if developed) $ N/A          Income Approach (if developed) $ N/A

Most weight and consideration has been given to the market approach. It best reflects buyers and sellers for this type of
property. The cost approach is best when the improvements are new. The Income approach is not considered since SFRs do not trade
based upon their income generating ability.

This appraisal is made [X] "as is,"  [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed,  [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed  [ ] subject to the following:
See Attached Addendum.

Based on the scope of work, assumptions, limiting conditions and appraiser's certification, my (our) opinion of the defined value of the real property
that is the subject of this report is $  602,000  as of 01/24/2014 , which is the effective date of this appraisal.



Produced using ACI software, 800.234.8727 www.aciweb.com          Ffm Form Copyright © 2005-2010 ACI Division of ISO Claims Servers, Inc., All Rights Reserved.          Page 2 of 6          (gPAR™) General Purpose Appraisal Report  12/2005          GPAR1024  05/051JE7/2

EX 5 pg 4 of 30

Harris Appraisals
Residential Appraisal Report          File No C140010

| FEATURE | SUBJECT | COMPARABLE SALE NO 4 | | COMPARABLE SALE NO 5 | | COMPARABLE SALE NO 6 | |
|---|---|---|---|---|---|---|---|
| Address | 1481 E. Covina Hills Rd. Covina | 20707 E. Covina Hills Rd. Covina | | 539 S. Rancho Vista Dr. Covina | | 1936 E. Rancho Culebra Dr. Covina | |
| Proximity to Subject | | 0.52 miles ESE | | 0.86 miles ENE | | 0.71 miles NE | |
| Sale Price | $ N/A | | $ 715,000 | | $ 580,000 | | $ 590,850 |
| Sale Price/Gross Liv Area | $ 0.00 sq ft. | $ 259.34 sq ft. | | $ 214.97 sq ft. | | $ 235.49 sq ft. | |
| Data Source(s) | Site Inspection | MRMLS# PW13154753; DOM: 115 | | MRMLS# CV13004658; DOM:11 | | MRMLS# CV13051625; DOM:32 | |
| Verification Source(s) | County Recs | Doc# 170233&Real Quest,MLS.Broker | | Doc# 20075&Real Quest,MLS.Broker | | Doc# 65680&Real Quest,MLS.Broker | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | N/A | Conventional | | Conventional | | Conventional | |
| Concessions | N/A | STD Sale | | STD Sale | | STD Sale | |
| Date of Sale/Time | N/A | 12/06/2013 | | 02/08/2013 | | 06/10/2013 | |
| Location | Subrb./Traffic | Subrb./Traffic | | Suburban | -12,000 | Suburban | -12,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 32,815 Sqft. | 24,117 Sq.Ft. | 35,000 | 20,958 Sq.Ft. | 24,000 | 12,393 Sq.Ft. | 41,000 |
| View | Residential | Residential | | City Lights | -17,000 | Residential | |
| Design (Style) | Traditional | Ranch | | Traditional | | Traditional | |
| Quality of Construction | Frame | Frame | | Frame | | Frame | |
| Actual Age | 52+/- Years | 50 Years | | 41 Years | | 46 Years | |
| Condition | Fair | Good | -40,000 | Average | -20,000 | Good | -40,000 |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 8  4  3 | 8  4  3 | | 8  4  2.5 | 5,000 | 8  4  3 | |
| Gross Living Area | 80  2,499 sq ft. | 2,757 sq ft. | -20,600 | 2,698 sq ft. | -15,920 | 2,509 sq ft. | |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Gas FAU C/Air | Gas FAU C/Air | | Gas FAU C/Air | | Gas FAU C/Air | |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 2 Car Garage | 3 Car Garage | -5,000 | 2 Car Garage | | 2 Car Garage | |
| Porch/Patio/Deck | Patio,Porch | Patio,Porch | | Patio,Porch | | Patio,Porch | |
| Fireplaces | 2 F/P | 2 F/P | | 1 Fpl | 1,000 | 1 F/P | |
| Pool | Pool/Spa | No Pool | 15,000 | No Pool | 15,000 | Pool | 3,000 |
| Net Adjustment (Total) | | ☐ +  ☒ - $ 15,600 | | ☐ +  ☒ - $ 19,920 | | ☐ +  ☒ - $ 8,000 | |
| Adjusted Sale Price of Comparables | | Net Adj -2.2% Gross Adj 16.2% $ 699,400 | | Net Adj -3.4% Gross Adj 19.0% $ 560,080 | | Net Adj -1.4% Gross Adj 16.2% $ 582,850 | |

Summary of Sales Comparison Approach   The appraiser adjust price per square foot at $80.00 per square foot based on discounts for site and amenity conditions in the market at the time of sale. The appraiser only adjusts for discrepancies of 100 square feet or more. Where applicable, otherwise adjustments for superior room count and additional amenities are based on paired sale analysis of existing comparables and a brief overview of surrounding listings sales. If similar amenities are not available within the market, no positive adjustments are made due to lack of support within the market and to avoid across the board adjustments.

Fxn Form Copyright © 2005-2013 ACI Division of ISO Claim Services, Inc., All Rights Reserved.
(gPAR™) General Purpose Appraisal Report  1/2005
GPAR1204 05/05/2010

89

EX 5 pg 5 of 30

Harris Appraisals

Residential Appraisal Report                                                    File No C140010

| FEATURE | SUBJECT | COMPARABLE SALE NO 7 | | COMPARABLE SALE NO 8 | | COMPARABLE SALE NO 9 | |
|---|---|---|---|---|---|---|---|
| 1481 E. Covina Hills Rd. | | 663 N. Jalapa Dr. | | | | | |
| Address Covina | | Covina | | | | | |
| Proximity to Subject | | 0.49 miles ENE | | | | | |
| Sale Price | $ N/A | | $ 759,000 | | $ | | $ |
| Sale Price/Gross Liv Area | $ 0.00 sq ft | $ 275.80 sq ft | | $ 0.00 sq ft | | $ 0.00 sq ft | |
| Data Source(s) | Site Inspection. | MRMLS# 13710535; DOM:111 | | | | | |
| Verification Source(s) | County Recs | Doc# N/A/Real Quest,MLS Broker | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | N/A | N/A | | | | | |
| Concessions | N/A | STD Sale | | | | | |
| Date of Sale/Time | N/A | Active | -30,000 | | | | |
| Location | Subrb./Traffic | Suburban | -15,000 | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 32,815 Sqft. | 19,352 Sq.Ft. | 27,000 | | | | |
| View | Residential | Residential | | | | | |
| Design (Style) | Traditional | Traditional | | | | | |
| Quality of Construction | Frame | Frame | | | | | |
| Actual Age | 52+/- Years | 39 Years | | | | | |
| Condition | Fair | Superior | -40,000 | | | | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 8  4    3 | 8  4   2.5 | 5,000 | | | | |
| Gross Living Area  80 | 2,499 sq ft | 2,752 sq ft | -20,200 | sq ft | | sq ft | |
| Basement & Finished | N/A | N/A | | | | | |
| Rooms Below Grade | N/A | N/A | | | | | |
| Functional Utility | Average | Average | | | | | |
| Heating/Cooling | Gas FAU C/Air | Gas FAU C/Air | | | | | |
| Energy Efficient Items | None Noted | None Noted | | | | | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | | | | |
| Porch/Patio/Deck | Patio,Porch | Patio,Porch | | | | | |
| Fireplaces | 2 F/P | 1 Fpl | | | | | |
| Pool | Pool/Spa | Pool/Spa | | | | | |
| Net Adjustment (Total) | | ☐+  ☒-  $ | 73,200 | ☒+  ☐-  $ | 0 | ☒+  ☐-  $ | 0 |
| Adjusted Sale Price | | Net Adj  -9.6% % | | Net Adj  0.0% % | | Net Adj  0.0% % | |
| of Comparables | | Gross Adj 18.1% % $ | 685,800 | Gross Adj 0.0% % $ | 0 | Gross Adj 0.0% % $ | 0 |

Summary of Sales Comparison Approach

gpar

Produced using ACI software, 800 234 8727 www.aciweb.com
Page 3 of 4

This form Copyright © 2005-2010 ACI Division of ISO Claims Services, Inc. All Rights Reserved
(GPAR™) General Purpose Appraisal Report  12/2005
GPAR1004  05/09/10010

90

EX 5 pg 6 of 30

| Client: homeowner | | File No.: C140010 |
|---|---|---|
| Property Address: 1481 E. Covina Hills Rd. | | Case No.: |
| City: Covina | State: CA | Zip: 91724 |

DEFINITION OF VALUE...the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:(1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial agreements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by seller as a result of tradition of law in a market area; these costs are readily indentifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

COMMENTS ON DIGITAL SIGNATURE...This report contains digital signatures -- in line with applicable federal law. The affixed digital signature is a true representation of my hand-written signature. Furthermore, the ability to affix my digital signature to this or any other appraisal report is secured from use by parties other than myself by encryption and password protection.

COMMENTS ON COMPETITIVE LISTINGS..." I have considered relevant competitive listings and/or contract offerings in the performance of this appraisal an in the trending information reported in this section. If a trend is indicated, I have attached an addendum providing relevant competitive listing/contract offering data.

COMMENTS ON SALES COMPARISON...All sales are considered the best available and deemed reliable.  All sales are considered from competing neighborhood locations. All comparable sales are of similar style. All sales are closed transactions. All sales are considered the best available and deemed reliable. No adjustments were made for date of sale or appreciation. The appraiser adjust price per square foot at $80.00 per square foot based on discounts for site and amenity conditions in the market at the time of sale. The appraiser only adjusts for discrepancies of 100 square feet or more. Where applicable, otherwise adjustments for superior room count and additional amenities are based on paired sale analysis of existing comparables and a brief overview of surrounding listings sales. If similar amenities are not available within the market, no positive adjustments are made due to lack of support within the market and to avoid across the board adjustments.

FINAL RECONCILIATION...The income approach is not considered to be relevant as there is no market data to support this type of analysis. the market approach is traditionally considered to be the most reliable indicator of value as it best reflects the current market conditions, including financing.

SALES HISTORY..The appraiser has confirmed that the subject has not sold, transferred, or been listed in the last 36 months.

PERSONAL PROPERTY...No items of personal property, fixtures or intangible property were included in the estimated property value, unless otherwise stated in the report.

ENVIRONMENTAL DISCLAIMER...The value estimated in this report is based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions.  The appraiser is not an expert in the identification of hazardous substances or detrimental environmental conditions.  The appraiser's routine inspection of the subject property did not develop any information that indicated any apparent significant hazardous substances or detrimental environmental conditions which would affect the property negatively.  It is possible that tests and inspections made by a qualified hazardous substance and environmental expert would reveal the existence of hazardous materials and environmental conditions on or around the property that would negatively affect its value. The appraiser, however, is not qualified to detect such substances. The existence of any potential urea-formaldehyde foam insulation, hazardous waste material or radon may have an effect on the value of the property.  We urge the client to retain an expert in this field if desired.

SUPPLEMENTAL CERTIFICATION AND LIMITING CONDITIONS...1.  Unless otherwise indicated in this report, the date of this report is the same date as the date of the appraisal.2.  Unless otherwise indicated in this report, a financial institution intends to use this report to determine the market value of the subject property for purposes of granting a federally related mortgage loan.3.  Unless otherwise indicated in this report, the subject property's market value was based on the cash price.4.  Unless otherwise indicated in this report, all usual valuation approaches were utilized.5.  Unless otherwise indicated in this report no extraordinary influences (e.g., easements, restrictions, encumbrances, leases, reservations, covenants, contracts, special assessments) on market value exist.6.  Unless otherwise indicated and specifically itemized with a value estimate, no personal property, trade fixtures, or intangible items are included in the appraisal of the subject property.7.  Unless otherwise indicated in this report the subject property os not currently listed for sale or subject to any safe agreement or option.8.  Unless otherwise indicated in this report and spacially itemized, according to public records, listing services and the homeowner, the subject property has not bee transferred in the past 12 months.9.  Unless otherwise indicated in this report, the estimated marketing time for the subject property was determined from available data services and listing services.  Unless otherwise indicated in this report, information from such data and listing services is believed to be reliable and was considered in  the final reconciliation of market value.10.  Unless otherwise indicated in this report, the reasoning used to determine the selection of "increasing", "stable", or "declining" in the neighborhood section of current market conditions and trends of this report, was based on information provided by available data services and listing services.11. Unless otherwise indicated in this report, this report is based on current land use regulations and the probability of modification of current land use regulations is unlikely.12.  Unless otherwise indicated in this report, the site value listed in

EX 5 pg 7 of 30

ADDENDUM

| Client: homeowner | | File No.: C140010 |
| Property Address: 1481 E. Covina Hills Rd. | | Case No.: |
| City: Covina | State: CA | Zip: 91724 |

the appraisal is determined as though the land is vacant and available for development to its highest investment use and the appraisal of improvements is based on their actual contribution to the site.13.  Unless otherwise indicated in this report, the appraised value is not effected by anticipated public or private improvements.14.  Unless otherwise indicated in this report, if proposed improvements were appraised the following were (and remain available to be) inspected: Plans, specifications and related documentation to identify scope and character of improvements; evidence indicating probable time of completion; and clear and appropriate evidence supporting development costs, anticipated earning, occupancy projections and anticipated competition on completion.15.  Unless otherwise indicated in this report, the subject property is not a fractional interest, physical segment, component or partial holding of a property.16.  Unless otherwise indicated in this report, information of rental data, operating expenses and capitalization was not obtained due to the lack of reliable rental data for single family homes in the subject property's neighborhood.17.  Unless otherwise indicated in this report, the subject property is not a leased fee or lease hold estate.18.  Unless otherwise indicated in this report, the existence of hazardous substances, including without limitation, asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection.  The appraiser has no knowledge of existence of such material on or in the property  unless otherwise stated.  If the presence of such substances, such as asbestos, urea-formaldehyde, foam insulation, or other hazardous substances or environmental conditions may affect the value of the property, the value estimated is predicted on the assumption that there is no such condition on or in the property or in such proximity there to that it would cause a loss in value.19.  Unless otherwise indicated in this report, no other limiting conditions or extraordinary assumptions (e.g. pending lease, atypical financing, completion of improvements) directly affect the appraisal or the analyses, opinions, and conclusions stated herein.20.  Additional Certifications:A.  Unless otherwise stated in this report, in accordance with the competency provision of the Uniform Standard of Professional Appraisal Practice, I have verified that my knowledge and experience are sufficient to allow me to competently complete this appraisal.B.  I have no personal interest or bias with respect to the parties involved or the subject property.C.  The appraisal assignment was not based on a requested minimum valuation, a specific valuation. or the approval of a loan, and by compensation is not contingent upon direction in value that favors the cause of the client. the amount of the value estimate, the attainment of a stipulated result or the occurrence of a subsequent event.D.  My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with Uniform Standard of Professional Appraisal Practice.  The departure provision of the Uniform Standard of Professional Appraisal Practice was not utilized in preparation of this report.E.  The report analyses, opinions and conclusions are limited only by the reported assumptions, limiting conditions and are my personal, unbiased analyses, opinions and conclusions.F.  Unless otherwise stated in this report, no one provided significant professional assistance to me in the preparation of this report.G.  I certify that, to the best of my knowledge and belief, the statements contained in this report are true and correct.H.  I certify that on the date of the appraisal report I was actively licensed by the appropriate state agency to perform the subject appraisal.

**Legal Description**
CHAFFEY TRACT LOT COM AT SW COR OF LOT 33 TRACT NO 21296 TH N 8316'14" E 61.4 FT TH S 643'15" E TO N LINE OF COVINA HILLS RD TH W THEREON 110 FT TH N 643'15" W 261.4 FT TH N 3816'45" E LOT 3

**Neighborhood Description**
The subject neighborhood is located in Covina, is a small city in Los Angeles County, California about 22 miles (35 km) east of downtown Los Angeles, in the San Gabriel Valley region. The population was 47,796 at the 2010 census, up from 46,837 at the 2000 census. The subject is located in Covina Hills a community of homes  that are similar in design, age and appeal. The neighborhood exhibits average to good maintenance levels. The subject neighborhood is within relatively close proximity to the 10 Freeway which grants  access to employment centers . The subject market is located close to recreational areas, shopping, schools, and municipal services and has average appeal to buyers in the market.

**Neighborhood Market Conditions**
Current market conditions favor standard conventional and FHA financing. Market time was obtained from multiple listing service data and the appraisers' observations of the subject property's market area. MARKETING TIME: The estimated marketing time for the subject under current market conditions is more than 90  calendar days. This estimate considers size, condition, location, and price range of the subject and surrounding properties.

**Comments on Sales Comparison**
All market data was confirmed by Multiple Listing Service, Appraiser drive by,  Agent or Public Records. Comparables were given consideration and weight based on net and gross adjustments.  The comparables included in this report were the best available at the time of inspection and all information was deemed reliable. Gross and net adjustments do not fall within appraisal guidelines of under 25% and 15% respectively due to the subject's deferred maintenance. All comparables used in this report are located in similar competing neighborhoods and there is no adjustment made for location.

Most weight was given to comparable #1 which is a closed REO sale which was sold as a fixer which was in similar condition as the subject due to deferred maintenance. Comparable #1 has similar gross living area, bed/bathcount, two fireplaces, and similar in-ground pool. Comparable #1 was adjusted for superior location, garage count, inferior lot size, and enclosed patio.

Comparable #2 is a closed standard sale that has not been recently updated but was adjusted for superior condition due to less deferred maintenance. Comparable #2 is inferior in gross living area, bed/bath count, garage count, lot size, and lacks an in-ground pool.

Comparable #3 is a closed short sale that is located on the same street as the subject and as a result suffers from the similar external obsolescence. Comparable #3 also has similar bed/bath count, and fireplace count. Comparable #3 is superior in lot size, condition, gross living area, and garage count.

Comparable #4 is a closed standard sale that is similar in bed/bath count, age, and external obsolescence. Comparable # 4 is superior in condition due to recent remodeling that includes granite counters, new carpet, plantation shutters, and interior paint. Comparable #4 was also adjusted for superior GLA, and bathroom count.

Comparable #5 is a closed standard sale that is similar in bedroom count and garage count. Comparable #5 was adjusted for inferior lot size, superior view, condition, GLA, and inferior bathroom count.

Comparable # 6 is a closed standard sale that is inferior in lot size and is similar in bed/bath count, in-ground pool, and GLA.

EX 5 pg 8 of 30

| Client: homeowner | | File No.: C140010 | |
| Property Address: 1481 E. Covina Hills Rd. | | Case No.: | |
| City: Covina | State: CA | Zip: 91724 | |

Comparable #6 has been recently remodeled and was adjusted for it's superior condition.

Comparable #7 is an active standard listing that has been recently remodeled and adjusted for it's superior condition and upgrades. Comparable #7 has a similar bedroom count, superior gross living area, inferior bathroom count, lot size, and superior location.

**Conditions of Appraisal**
Value assigned to the subject in it's "AS IS" condition. Deem this a summary report. Use of this appraisal is intended only for the Client mentioned on page one of GPAR.

EX 5 pg 9 of 30

Ref No. C140010

## Scope of Work, Assumptions and Limiting Conditions

Scope of work is defined in the Uniform Standards of Professional Appraisal Practice as " the type and extent of research and analyses in an assignment." In short, scope of work is simply what the appraiser did and did not do during the course of the assignment. It includes, but is not limited to: the extent to which the property is identified and inspected, the type and extent of data researched, the type and extent of analyses applied to arrive at opinions or conclusions.

The scope of this appraisal and ensuing discussion in this report are specific to the needs of the client, other identified intended users and to the intended use of the report. This report was prepared for the sole and exclusive use of the client and other identified intended users for the identified intended use and its use by any other parties is prohibited. The appraiser is not responsible for unauthorized use of the report.

The appraiser's certification appearing in this appraisal report is subject to the following conditions and to such other specific conditions as are set forth by the appraiser in the report. All extraordinary assumptions and hypothetical conditions are stated in the report and might have affected the assignment results.

1. The appraiser assumes no responsibility for matters of a legal nature affecting the property appraised or title thereto, nor does the appraiser render any opinion as to the title, which is assumed to be good and marketable. The property is appraised as though under responsible ownership

2. Any sketch in this report may show approximate dimensions and is included only to assist the reader in visualizing the property. The appraiser has made no survey of the property.

3. The appraiser is not required to give testimony or appear in court because of having made the appraisal with reference to the property in question, unless arrangements have been previously made thereto.

4. Neither all, nor any part of the content of this report, copy or other media thereof (including conclusions as to the property value, the identity of the appraiser, professional designations, or the firm with which the appraiser is connected), shall be used for any purposes by anyone but the client and other intended users as identified in this report, nor shall it be conveyed by anyone to the public through advertising, public relations, news, sales, or other media, without the written consent of the appraiser.

5. The appraiser will not disclose the contents of this appraisal report unless required by applicable law or as specified in the Uniform Standards of Professional Appraisal Practice.

6. Information, estimates, and opinions furnished to the appraiser, and contained in the report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished to the appraiser is assumed by the appraiser.

7. The appraiser assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The appraiser assumes no responsibility for such conditions, or for engineering or testing, which might be required to discover such factors. This appraisal is not an environmental assessment of the property and should not be considered as such.

8. The appraiser specializes in the valuation of real property and is not a home inspector, building contractor, structural engineer, or similar expert, unless otherwise noted. The appraiser did not conduct the intensive type of field observations of the kind intended to seek and discover property defects. The viewing of the property and any improvements is for purposes of developing an opinion of the defined value of the property, given the intended use of this assignment. Statements regarding condition are based on surface observations only. The appraiser claims no special expertise regarding issues including, but not limited to, foundation settlement, basement moisture problems, wood destroying (or other) insects, pest infestation, radon gas, lead based paint, mold or environmental issues. Unless otherwise indicated, mechanical systems were not activated or tested.

This appraisal report should not be used to disclose the condition of the property as it relates to the presence/absence of defects. The client is invited and encouraged to employ qualified experts to inspect and address areas of concern. If negative conditions are discovered, the opinion of value may be affected.

Unless otherwise noted, the appraiser assumes the components that constitute the subject property improvement(s) are fundamentally sound and in working order.

Any viewing of the property by the appraiser was limited to readily observable areas. Unless otherwise noted, attics and crawl space areas were not accessed. The appraiser did not move furniture, floor coverings or other items that may restrict the viewing of the property.

9. Appraisals involving hypothetical conditions related to completion of new construction, repairs or alteration are based on the assumption that such completion, alteration or repairs will be competently performed.

10. Unless the intended use of this appraisal specifically includes issues of property insurance coverage, this appraisal should not be used for such purposes. Reproduction or Replacement cost figures used in the cost approach are for valuation purposes only, given the intended use of the assignment. The Definition of Value used in this assignment is unlikely to be consistent with the definition of Insurable Value for property insurance coverage use.

11. The ACI General Purpose Appraisal Report (GPAR™) is not intended for use in transactions that require a Fannie Mae 1004/Freddie Mac 70 form, also known as the Uniform Residential Appraisal Report (URAR).

Additional Comments Related To Scope Of Work, Assumptions and Limiting Conditions

**gpar™**
general purpose appraisal report

Produced using ACI software, 800 234 8727 www.aciweb.com
Page 1 of 2

This form Copyright © 2005-2010 ACI Division of ISO Clients Services, Inc. All Rights Reserved.
(GPAR™) General Purpose Appraisal Report 12/2005
GPAR5.M 09.081.2008

94

EX 5 pg 10 of 30

File No. C140010

## Appraiser's Certification

The appraiser(s) certifies that, to the best of the appraiser's knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are the appraiser's personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. Unless otherwise stated, the appraiser has no present or prospective interest in the property that is the subject of this report and has no personal interest with respect to the parties involved.

4. The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. The appraiser's engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. The appraiser's compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. The appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8. Unless otherwise noted, the appraiser has made a personal inspection of the property that is the subject of this report.

9. Unless noted below, no one provided significant real property appraisal assistance to the appraiser signing this certification. Significant real property appraisal assistance provided by:

Additional Certifications:

Definition of Value: [X] Market Value   [ ] Other Value: _____
Source of Definition: Fannie Mae
**DEFINITION OF VALUE...the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:(1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial agreements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.**

ADDRESS OF THE PROPERTY APPRAISED:
1481 E. Covina Hills Rd.
Covina, CA 91724
EFFECTIVE DATE OF THE APPRAISAL: January 24, 2014
APPRAISED VALUE OF THE SUBJECT PROPERTY $ 602,000

| APPRAISER | SUPERVISORY APPRAISER |
|---|---|
| Signature | Signature |
| Name: Chad Harris | Name: |
| State Certification # | State Certification # |
| or License # AR031917 | or License # |
| or Other (describe): State #: | State: |
| State: CA | Expiration Date of Certification or License: |
| Expiration Date of Certification or License: 09/18/2015 | Date of Signature: |
| Date of Signature and Report: 01/27/2014 | Date of Property Viewing: |
| Date of Property Viewing: 01/24/2014 | Degree of property viewing: |
| Degree of property viewing: [X] Interior and Exterior [ ] Exterior Only [ ] Did not personally view | [ ] Interior and Exterior [ ] Exterior Only [ ] Did not personally view |

Produced using ACI software, 800.234.8727 www.aciweb.com
Page 2 of 2

gpar

Harris Appraisals
95

This form Copyright © 2005-2010 ACI Division of ISO Claims Services, Inc., All Rights Reserved.
(gPAR™) General Purpose Appraisal Report 120205
GPAR2LM 05141T3008

EX 5 pg 11 of 30

DIMENSION LIST APPENDUM

| | | | | |
|---|---|---|---|---|
| Client: homeowner | | | File No.: | C140010 |
| Property Address: 1481 E. Covina Hills Rd. | | | Case No.: | |
| City: Covina | | State: CA | Zip: 91724 | |

| GROSS BUILDING AREA (GBA) | 2,499 |
|---|---|
| GROSS LIVING AREA (GLA) | 2,499 |

| Area(s) | Area | % of GLA | % of GBA |
|---|---|---|---|
| Living | 2,499 | | 100.00 |
| Level 1 | 2,499 | 100.00 | 100.00 |
| Level 2 | 0 | 0.00 | 0.00 |
| Level 3 | 0 | 0.00 | 0.00 |
| Other | 0 | 0.00 | 0.00 |
| Basement | GBA ☐ 0 | | |
| Garage | ☐ 484 | | |

### Area Measurements

| Measurements | Factor | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
|---|---|---|---|---|---|---|---|---|
| 6.00 x 12.00 | x 1.00 = | 72.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 25.00 x 60.00 | x 1.00 = | 1,500.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 24.00 x 6.00 | x 1.00 = | 144.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 27.00 x 29.00 | x 1.00 = | 783.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 22.00 x 22.00 | x 1.00 = | 484.00 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

EX 5 pg 12 of 30

SUBJECT PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Client: homeowner | |
| Property Address: 1481 E. Covina Hills Rd. | File No.: C140010 |
| | Case No.: |
| City: Covina | State: CA    Zip: 91724 |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: January 24, 2014
Appraised Value: $ 602,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

EX 5 pg 13 of 30

COMPARABLE PROPERTY PHOTO ADDENDUM

| | | |
|---|---|---|
| Client: homeowner | File No.: C140010 | |
| Property Address: 1481 E. Covina Hills Rd | Case No.: | |
| City: Covina | State: CA | Zip: 91724 |



**COMPARABLE SALE #1**

20510 E. Rancho San Jose Dr.
Covina
Sale Date: 05/28/2013
Sale Price: $ 610,000



**COMPARABLE SALE #2**

19601 E. Covina Hills Rd.
Covina
Sale Date: 08/16/2013
Sale Price: $ 499,950



**COMPARABLE SALE #3**

20422 E. Covina Hills Rd.
Covina
Sale Date: 05/16/2013
Sale Price: $ 680,000

98

EX 5 pg 14 of 30

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Client: Homeowner | |
| Property Address: 1481 E. Covina Hills Rd | File No.: C140010 |
| City: Covina | State: CA    Zip: 91724 |



**COMPARABLE SALE #4**

20707 E. Covina Hills Rd.
Covina
Sale Date: 12/06/2013
Sale Price: $ 715,000



**COMPARABLE SALE #5**

539 S. Rancho Vista Dr.
Covina
Sale Date: 02/08/2013
Sale Price: $ 580,000



**COMPARABLE SALE #6**

1936 E. Rancho Culebra Dr.
Covina
Sale Date: 06/10/2013
Sale Price: $ 590,850

EX 5 pg 15 of 30

COMPARABLE PROPERTY PHOTO ADDENDUM

| Client: homeowner | | | |
|---|---|---|---|
| Property Address: 1481 E. Covina Hills Rd. | | File No.: C140010 | |
| City: Covina | State: CA | Case No.: | Zip: 91724 |



**COMPARABLE SALE #7**

663 N. Jalapa Dr.
Covina
Sale Date: Active
Sale Price: $ 759,000

**COMPARABLE SALE #8**

Sale Date:
Sale Price: $

**COMPARABLE SALE #9**

Sale Date:
Sale Price: $

100

Client: Homeowner

File No.: C140010

Property Address: 1481 E. Covina Hills Rd

Case No.:

City: Covina

State: CA

Zip: 91724



Garage



Pool



Exterior Stucco

| Client:    homeowner | | File No:   C140010 |
| Property Address: 1481 E. Covina Hills Rd | | Case No.: |
| City: Covina | State: CA | Zip: 91724 |



Rear Yard



Side View



Side View

| | |
|---|---|
| Client: homeowner | File No.: C140010 |
| Property Address: 1481 E. Covina Hills Rd | Case No.: |
| City: Covina | State: CA  Zip: 91724 |



Rear Yard



Asphalt Driveway



Side View

EX 5 pg 19 of 30

| Client: Homeowner | | File No.: C140010 |
| Property Address: 1481 E. Covina Hills Rd | | Case No.: |
| City: Covina | State: CA | Zip: 91724 |



Asphalt Driveway



Missing Switch PLate/Expose Wiring



Missing Switch PLate/Expose Wiring

EX 5 pg 20 of 30

| Client: homeowner | File No.: C140010 |
| Property Address: 1481 E. Covina Hills Rd | Case No.: |
| City: Covina | State: CA | Zip: 91724 |



Living Room



Kitchen Cabinets



Kitchen

| Client: Homeowner | | File No.: C140010 | |
| Property Address: 1481 E. Covina Hills Rd | | Case No.: | |
| City: Covina | State: CA | | Zip: 91724 |



Microwave



Water Damaged Cabinets



Living Room

EX 5 pg 22of30

| Client: Homeowner | | File No.: C140010 |
| Property Address: 1481 E. Covina Hills Rd | | Case No.: |
| City: Covina | State: CA | Zip: 91724 |



Kitchen Floor



Wood Flooring



Missing Closet Doors

Produced using ACI software, 800 234 8727 www.aciweb.com

EX S pg 23 of 30

Client: homeowner
Property Address: 1481 E. Covina Hills Rd.
City: Covina
File No.: C140010
Case No.:
State: CA
Zip: 91724



Damaged Interior Door



Damaged Interior Door



Updated Hall Bathroom

| Client: homeowner | | File No.: C140010 |
| Property Address: 1481 E. Covina Hills Rd | | Case No.: |
| City: Covina | State: CA | Zip: 91724 |



Hall Bathroom



Hall Bathroom Floor



Damaged Bathroom Door

EX 5 pg 25 of 30

| Client: homeowner | File No.: C140010 |
| Property Address: 1481 E. Covina Hills Rd | Case No.: |
| City: Covina | State: CA | Zip: 91724 |



Interior Wall



Master Bathroom



Master Bathroom Floor



FLOOR PLAN SKETCH

| Client: homeowner | | File No.: C140010 |
|---|---|---|
| Property Address: 1481 E. Covina Hills Rd. | | Case No.: |
| City: Covina | State: CA | Zip: 91724 |



Sketch by Apex Medina™

Comments:

### AREA CALCULATIONS SUMMARY

| Code | Description | Net Size | Net Totals |
|---|---|---|---|
| GLA1 | First Floor | 2499.0 | 2499.0 |
| GAR | Garage | 484.0 | 484.0 |

### LIVING AREA BREAKDOWN

| Breakdown | | Subtotals |
|---|---|---|
| First Floor | | |
| 12.0 x | 6.0 | 72.0 |
| 60.0 x | 25.0 | 1500.0 |
| 6.0 x | 24.0 | 144.0 |
| 29.0 x | 27.0 | 783.0 |

| Net LIVABLE Area | (rounded) | 2499 | 4 Items | (rounded) | 2499 |
|---|---|---|---|---|---|

EX 5 pg 27 of 30

| Client: homeowner | | File No.: C140010 | |
| Property Address: 1481 E. Covina Hills Rd. | | Case No.: | |
| City: Covina | State: CA | | Zip: 91724 |



Comparable Sale 8
1936 E Rancho Culebra Dr
Covina, CA 91724
(0.71 miles NE)

Comparable Sale 6
539 S Rancho Vista Dr
Covina, CA 91724
(0.86 miles ENE)

Comparable Sale 9
863 N Jalapa Dr
Covina, CA 91724
(0.49 miles ENE)

Comparable Sale 1
19601 E Covina Hills Rd
Covina, CA 91724
(0.68 miles WNW)

Comparable Sale 2
1053 E Covina Hills Rd
Covina, CA 91724
(0.57 miles WNW)

Subject
1481 E Covina Hills Rd
Covina, CA 91724

Comparable Sale 5
1412 E Covina Hills Rd
Covina, CA 91724
(0.12 miles SW)

Comparable Sale 7
20510 E Rancho San Jose Dr
Covina, CA 91724
(0.26 miles E)

Comparable Sale 3
20422 E Covina Hills Rd
Covina, CA 91724
(0.18 miles ESE)

Comparable Sale 4
20707 E Covina Hills Rd
Covina, CA 91724
(0.52 miles ESE)

0.74 mile

EX 5 pg 28 of 30

PLAT MAP

| Client: homeowner | | File No.: C140010 |
| Property Address: 1481 E. Covina Hills Rd. | | Case No.: |
| City: Covina | State: CA | Zip: 91724 |



TRACT NO. 21296
M.B. 569-48-50

CHAFFEY TRACT
M. B. 59-14

EX 5 pg 24 of 30

Harris Appraisals

File No. C140010

········ INVOICE ········

File Number: C140010                    01/24/2014

Invoice # :
Order Date :
Reference/Case # :
PO Number :

1481 E. Covina Hills Rd.
Covina, CA  91724

| | | |
|---|---|---|
| GPAR | $ | 350.00 |
| | $ | |
| | | |
| Invoice Total | $ | 350.00 |
| State Sales Tax @ | $ | 0.00 |
| Deposit | ($ | 350.00 ) |
| Deposit | ($ | ) |
| Amount Due | $ | 0.00 |

Terms:   Paid

Please Make Check Payable To:

Harris Appraisals

Fed. I.D. #: C.H.

15218 Summit Avenue, Ste. 300 #348 Fontana, CA 92336

EX 5 pg 30 of 30

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**100 N. Barranca Avenue, Suite 250, West Covina, CA 91791**

A true and correct copy of the foregoing document described as **DEBTOR'S NOTICE OF MOTION AND MOTION TO AVOID JUNIOR LIEN ON PRINCIPAL RESIDENCE [11 U.S.C. § 506(d)]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Order(s) and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL OR OVERNIGHT MAIL (state method for each person or entity served):**
On **February 27, 2014**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| | | |
|---|---|---|
| Honorable Julia Brand | Nancy Curry | Robert Algot Winberg |
| United States Bankruptcy Judge | Chapter 13 Trustee | 1481 E. Covina Hills Road |
| 255 East Temple St., Suite 1382 | 700 S. Flower Street, Suite 1215 | Covina, CA 91724 |
| Los Angeles, CA 90012 | Los Angeles, CA 90017 | |

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 27, 2014 | Gregory Hidalgo | _(signature)_ |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                                Page 8                                **F 4003-2.4.JR.LIEN.MOTION**

115

**2. SERVED BY UNITED STATES MAIL, CERTIFIED MAIL OR OVERNIGHT MAIL (indicate method for each person or entity served):**

*(Attached page to Proof of Service of Document-please include any additional or alternative addresses and attach additional pages if needed)*
*(Certified Mail required for service on a national bank.)*

| Lienholder (name and address) | Address from: | Delivery Method |
|---|---|---|
| *1st lienholder (name and address)*<br><br>Wells Fargo Home Mortgage<br>8480 Stagecoach Circle<br>Frederick, MD 21701 | ☐ Proof of claim ☐ Secretary of State<br>☐ FDIC website ☒ Other *(specify)*:<br><br>*Credit Report* | ☐ United States mail<br>☒ Certified mail –<br>Tracking # _____<br>☐ Overnight mail – Tracking #<br>Carrier Name: |
| *1st lienholder (name) and Agent for*<br>*Service of Process for Wells Fargo Home Mortgage*<br><br>CSC-Lawyers Incorporating Service<br>2730 Gateway Oaks Dr., Suite 100<br>Sacramento, CA 95833 | ☐ Proof of claim ☒ Secretary of State<br>☐ FDIC website ☐ Other *(specify)*: | ☐ United States mail<br>☒ Certified mail –<br>Tracking  # _____<br>☐ Overnight mail – Tracking #<br>Carrier Name: |
| *1st lienholder (name) and Servicing*<br>*Agent (name and address) – Additional Address*<br><br>Wells Fargo Bank<br>John Stumpf/President & CEO<br>101 N. Phillips Avenue<br>Sioux Falls, SD 57104 | ☐ Proof of claim ☐ Secretary of State<br>☒ FDIC website ☐ Other *(specify)*:<br><br>*Web Search* | ☐ United States mail<br>☒ Certified mail –<br>Tracking # _____<br>☐ Overnight mail – Tracking #<br>Carrier Name: |
| *2nd lienholder (name and address)*<br><br>JP Morgan Chase Bank, N.A.<br>c/o LCS Financial Services Corporation<br>6782 South Potomac Street, Suite 100<br>Centennial, CO 80112 | ☒ Proof of claim ☐ Secretary of State<br>☐ FDIC website ☐ Other *(specify)*: | ☐ United States mail<br>☒ Certified mail –<br>Tracking # _____<br>☐ Overnight mail – Tracking #<br>Carrier Name: |
| *2nd lienholder (name) and Agent for*<br>*Service of Process for JP Morgan Chase Bank*<br><br>CT Corporation System<br>818 West Seventh Street<br>Los Angeles, CA 90017 | ☐ Proof of claim ☒ Secretary of State<br>☐ FDIC website ☐ Other *(specify)*: | ☐ United States mail<br>☒ Certified mail –<br>Tracking #_____<br>☐ Overnight mail – Tracking #<br>Carrier Name: |
| *2nd lienholder (name) and Servicing*<br>*Agent (name and address) – Additional Address*<br><br>JP Morgan Chase Bank, N.A.<br>Jamie Dimon/President & CEO<br>1111 Polaries Parkway<br>Columbus, OH 43240 | ☐ Proof of claim ☐ Secretary of State<br>☒ FDIC website ☐ Other *(specify)*:<br><br>*Web Search* | ☐ United States mail<br>☒ Certified mail –<br>Tracking # _____<br>☐ Overnight mail – Tracking #<br>Carrier Name: |

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                    Page 4                    **F 4003-2.4.JR.LIEN.MOTION**

116

| Name of 3rdt Lien Holder & Address | Address from: | Delivery Method |
|---|---|---|
| OneWest Bank, FSB<br>P.O. Box 829009<br>Dallas, TX 75382-9009 | ☒ Proof of claim ☐ Secretary of State<br>☐ FDIC website ☐ Other: *specify* | ☐US Mail<br>☒Certified mail –<br>Tracking # _____<br>☐Overnight mail –<br>Tracking #_____<br>Carrier Name: _____ |
| Name of 3rd Lien Holder –Agent for Service of Process for **OneWest Bank, FSB**<br><br>N/A | Address from:<br>☐ Proof of claim ☒ Secretary of State<br>☐ FDIC website ☐ Other: *specify*<br><br>*Web Search* | Delivery Method<br>☐US Mail<br>☐Certified mail –<br>Tracking # _____<br>☐Overnight mail –<br>Tracking #_____<br>Carrier Name: _____ |
| 3rd lienholder (name) and Servicing Agent (name and address) – Additional Address<br><br>OneWest Bank, FSB<br>Joseph Otting, President & CEO<br>888 E. Walnut Street<br>Pasadena, CA 91101 | Address from:<br>☐ Proof of claim ☐ Secretary of State<br>☒ FDIC website ☐ Other: *specify*<br><br>*Web Search* | Delivery Method<br>☐US Mail<br>☒Certified mail –<br>Tracking # _____<br>☐Overnight mail –<br>Tracking #_____<br>Carrier Name: _____ |

| 2nd lienholder Alternative/Additional Address | Address from: | Delivery Method |
|---|---|---|
| JP Morgan Chase Bank, N.A.<br>270 Park Avenue<br>New York, NY 10017 | ☒ Proof of claim ☐ Secretary of State<br>☐ FDIC website ☐ Other: *specify* | ☐US Mail<br>☒Certified mail –<br>Tracking # _____<br>☐Overnight mail –<br>Tracking #_____<br>Carrier Name: _____ |
| 3rd Lien Holder Alternative/Additional Address<br>**Attorney for OneWest Bank, FSB**<br><br>Buckley Madole, P.C.<br>301 E. Ocean Blvd., Suite 1720<br>Long Beach, CA 90802 | Address from:<br>☐ Proof of claim ☐ Secretary of State<br>☐ FDIC website ☒ Other: *specify*<br><br>*Objection to Plan* | Delivery Method<br>☐US Mail<br>☒Certified mail –<br>Tracking # _____<br>☐Overnight mail –<br>Tracking #_____<br>Carrier Name: _____ |
| 3rd Lien Holder Alternative/Additional Address<br><br>OneWest Bank, FSB<br>6900 Beatrice Drive<br>Kalamazoo, MI 49009 | Address from:<br>☐ Proof of claim ☐ Secretary of State<br>☐ FDIC website ☒ Other: *specify*<br><br>*Credit Report* | Delivery Method<br>☐US Mail<br>☒Certified mail –<br>Tracking # _____<br>☐Overnight mail –<br>Tracking #_____<br>Carrier Name: _____ |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                                           Page 2                        F 4003-2.4.JR.LIEN.MOTION

117